# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3   _____

 4   MODESTO RODRIGUEZ,

 5          Plaintiff,

 6      v.                              Case No:

 7   THE CITY OF NEW YORK, WARDEN STEVEN    21-CV-8565(CM)

 8   BASTIAN, OFFICER MICHELLE GONZALEZ,

 9   ANTOINETTE DOUGLAS, AND LACHONDA

10   LUCAS,

11          Defendants.

12   _____

13                  DEPOSITION

14   _____

15

16   WITNESS:          ANTOINETTE DOUGLAS

17   DATE:             Friday, October 20, 2023

18   START TIME:       12:20 p.m., ET

19   END TIME:         2:05 p.m., ET

20   REMOTE LOCATION:  Remote Legal platform

21   REPORTER:         Vanessa Van Wagner, CER/CDR-1602

22   JOB NO.:          20466

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3        RICKNER, PLLC

 4        14 Wall Street, Suite 1603

 5        New York, New York 10005

 6        By:  ROBERT RICKNER, ESQUIRE

 7             rob@ricknerpllc.com

 8        Appearing for Plaintiff

 9

10        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

11        28 Liberty Street

12        New York, New York 10005

13        By:  GEE WON CHA, ESQUIRE

14             geewon.cha@ny.ag.gov

15        Appearing for New York State Attorney General

16

17        CORPORATION COUNSEL

18        100 Church Street

19        New York, New York 10007

20        By:  JACQUELYN DAINOW, ESQUIRE

21             jadainow@law.nyc.gov

22        Appearing for Defendant, City of New York

23

24   ALSO PRESENT:

25        Sarah Schroeter, Notary Public
```

1                I N D E X   O F   T E S T I M O N Y

2

3    EXAMINATION OF ANTOINETTE DOUGLAS:              PAGE

4         By Mr. Rickner                          9, 52

5         By Ms. Dainow                          47, 59

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   sentences?

2       A    Yes.

3       Q    Okay.  And you started at the then Division of

4   Parole in 1992?

5       A    Yes, September of that year.

6       Q    Okay.  And what was your title when you

7   started?

8       A    Parole officer.

9       Q    Okay.  How long were you a parole officer?

10      A    Up until July 2019.

11      Q    And in July of 2019, did your job title

12  change?

13      A    Yes, I became a senior parole officer.

14      Q    Okay.  And what is the -- what is the

15  difference in your job responsibilities between being a

16  parole officer and a senior parole officer?

17      A    As a parole officer, you're directly

18  supervising parolees, and as a parole officer -- a

19  senior parole officer, you're directly supervising

20  parole officers.

21      Q    And is that still your job title?

22      A    No, I retired in October of 2022.

23      Q    When you retired, was that your job title?

24      A    Senior parole officer, yes.

25      Q    Okay.  Now let's go back to February of 2020.

1  Were you -- did you have a particular station or

2  assignment?  Meaning where were you physically working?

3      A    I worked out of DDOI, which is at Rikers

4  Island.

5      Q    Okay.  And where in Rikers Island were you

6  actually working?

7      A    In a judicial center.

8      Q    Okay.  And what was your responsibility in the

9  judicial center?

10      A    Essentially to release parolees --

11      Q    Okay.  Now --

12      A    -- to release them from --

13      (Witness dropped.)

14          MR. RICKNER:  Is that me or -- no, that's

15  her.  Well, we had a good run.

16          MS. DAINOW:  Let me see what's going on.

17          THE REPORTER:  Shall I go off the record

18  until the witness returns --

19          MR. RICKNER:  Yeah --

20          THE REPORTER:  -- or stay on?

21          MR. RICKNER:  I would appreciate that.

22  Sure.

23          THE REPORTER:  One moment, please.

24      (Off the record.)

25          THE REPORTER:  Back on the record at

1    10:31 a.m., Eastern.

2               MR. RICKNER:  Excellent.  So I'm trying

3    to remember where we stopped.

4    BY MR. RICKNER:

5         Q    Can you describe to me the process by which an

6    incarcerated parolee is released from Rikers Island when

7    they're being held there?  What are the steps?

8         A    Well, there's -- there -- there are more than

9    one way a parole is released, so depends on the

10   circumstance.  Are we talking a revoke and restore, a --

11   okay, so a revoke and restore is --

12        Q    Because I don't know -- so what are the

13   different ways that a parolee --

14        A    Okay.  So --

15        Q    -- can be released, and then we'll go through

16   the process.

17        A    -- okay.  So let's say it was a revoke and

18   restore.  The parole had a parole hearing, and the ALJ

19   decided that while he did violate, he can still be

20   returned back to supervision, okay.  So we would get a

21   copy of his ALJ decision, he would be scheduled for a

22   release interview, a parole officer would work up his

23   paperwork, see if there's any conditions that need to be

24   applied, check out the housing situation, and we would

25   have -- schedule a release interview, he would give --

1  be giving his reporting instructions, he would sign off

2  on his documents.  We would then lift our warrant with

3  New York City Department of Corrections, and once they

4  receive our warrant lift authorization, then they would

5  begin the process of releasing that incarcerated person.

6       Q    Okay.  Who is they?

7       A    They being the New York City Department of

8  Corrections.

9       Q    Okay.  All right, so I just want to sort of

10  walk through these a little bit.

11       A    Okay.

12       Q    So somebody goes to an ALJ, that's actually

13  would be a procedure at the judicial center?

14       A    That's correct.

15       Q    Okay.  And you say you get the decision.  How

16  is the decision transferred to DDOI?

17       A    By email.

18       Q    Who sends email?

19       A    The ALJ sends a decision.

20       Q    Oh, the ALJ would actually send the decision

21  to DDOI directly?

22       A    Yes.

23       Q    Okay.  And then there's an interview, I gather

24  that's regarding the parole conditions that the person

25  would face on the outside?

1        A     That's correct.

2        Q     Okay.  And then housing, that means you have

3    to confirm that they have someplace to go?

4        A     That's correct.

5        Q     All right.  Now -- and then there's the

6    lifting of the warrant.  What is that process?

7        A     Well, there's a form called the Warrant Lift

8    Authorization Form.  When we see the incarcerated

9    person, be it they come to us or we go to their

10   facility, they have what's known as a movement card,

11   it's an orange movement card.  On that movement card,

12   the actual warrant will be attached to that card, and

13   there's a space on the card where the date that the

14   warrant was received by whoever at Corrections actually

15   received it.  The warrant number is noted, the person

16   signs it, and it's dated the date that it was received.

17            So now that we're lifting the warrant, we

18   remove our warrant from the card.  There's a box on the

19   orange movement card that says Date Revoked, it would be

20   that day that we're revoking it.  Whoever it is that's

21   processing it would sign it, remove the warrant card

22   from the movement card, and then place our Warrant Lift

23   Authorization on top of the card, and then we would give

24   that back to New York City Corrections for them to then

25   do what they do with the Warrant Lift.

1      Q    Okay.  So let's say you've gotten the ALJ

2    decision.  It says, in sum and substance, this person

3    can be returned, who has to sign off on the Warrant Lift

4    at that point?

5      A    Whomever is actually processing the Warrant

6    Lift at the time.

7      Q    Okay.  Would that be if it was you as an SPO?

8    That would just be you signing the document?

9      A    Right.  But oftentimes it would be a PO that's

10   signing it, and they would sign their name for SPO

11   Douglas.

12     Q    Right.

13     A    Right.

14     Q    So I actually, for once, I think I might know

15   what you're talking about.  Hold on for one second, let

16   me upload this exhibit.  One second.  It's a one second

17   process.

18               MR. RICKNER:  I'm just going to share

19   this, and could the court report please mark it as

20   Exhibit 12?

21     (Exhibit 12 marked for identification.)

22   BY MR. RICKNER:

23     Q    Can you see what's -- can you see the document

24   on the screen?

25     A    I can, yes.

1       Q    Okay.  And what is this document?

2       A    It's a Warrant Lift Authorization.

3       Q    Okay.  And this was signed by PO Bailey; is

4    that right?

5       A    Yes.

6       Q    And for you?

7       A    Yes.

8       Q    Okay.  So I just want to go through this.  So

9    before this Warrant Lift Authorization is signed, what

10   needs to happen?  I mean, what other approvals are

11   there?

12      A    Well, the warrant has to be closed within our

13   -- our Department of Corrections, DOC out New York State

14   Parole Corrections.  The warrant has to be closed, it

15   has to be vacated.

16      Q    Okay.

17      A    We cannot -- we cannot lift an active warrant,

18   it has to be vacated.

19      Q    Okay.  And so let's say after the ALJ makes

20   their decision, how is the warrant converted from active

21   to --

22      A    Okay.

23      Q    -- vacated?

24      A    So when ALJ mails out the decision, it goes to

25   many people, right?  One of the persons that it goes to

1   warrant when the criminal court judge vacates the

2   warrant?

3        A    Well, those are traditionally immediate

4   warrant lifts.

5        Q    Okay.  So how does it -- how does it get into

6   the system as a warrant lift?

7        A    Same thing.  It comes -- well these warrant --

8   those will come from the counsel's office and it kind of

9   goes out to several other people, as I mentioned

10  earlier, and one of it is Internal Operations, and then

11  in Internal Operations, they would close out that

12  warrant, they will put the information in and it would

13  close the warrant.

14       Q    Okay.  So the counsel's office sends the

15  warrant to the office in Albany that you mentioned that

16  actually enters it into the system?

17       A    That is correct.

18       Q    And then once that's entered into the system,

19  you can sign the document, which is the warrant lift?

20       A    Correct, yes.

21       Q    And then that -- at that point, there's no

22  other impediments to releasing somebody?

23       A    Well, I mean, he still, the incarcerated

24  person, still needs to be interviewed for release.

25  Residents still need to be set up.  So those things

1    still have to occur.

2         Q    How long can you hold somebody waiting for the

3    interview if there's -- if the warrant has been lifted?

4         A    There was -- there was a process set up for

5    that.  We -- if we got -- if we got information on

6    Monday, by Wednesday, that person was released.  You --

7    you get it, you set the interview up, you see the person

8    hopefully the next day, and then you would then process

9    the release.

10        Q    Okay.  So no matter what, even if somebody has

11   a writ of habeas corpus, there's going to be a 48-hour

12   delay, potentially?

13        A    Not in all instances, no.

14        Q    But there could be?

15        A    But there could be, yes.

16        Q    Okay. Hold on.  One moment -- actually --

17             MR. RICKNER:  I'd like to share the next

18   exhibit and mark it as Exhibit 13.

19        (Exhibit 13 marked for identification.)

20             MR. RICKNER:  I'm just going to scroll

21   down to the bottom one, and can you -- can you see --

22   I'm going to try to get the whole -- whole thing on the

23   screen.

24   BY MR. RICKNER:

25        Q    Can you see that?  I've redirected you to page

1    independently and also zoom in and out independently.

2                    THE WITNESS:  Okay.

3                    THE REPORTER:  So if you're on that page,

4    you should be able to do that.

5                    THE WITNESS:  Okay.

6                    MR. RICKNER:  Unless I hit bring to me,

7    in which case it sort of forces you to look at

8    something.

9                    THE WITNESS:  Okay.  So no, all the

10   persons that's on this email are DDOI personnel and

11   Deputy Chiefs Lucas and Rose Williams who are with PBU.

12                   MR. RICKNER:  Got you.

13   BY MR. RICKNER:

14       Q    I'm scrolling up next to -- there's an email

15   from Elliot A. Mcintosh.

16       A    Uh-huh.

17       Q    Do you see that?  To you?

18       A    To me.

19       Q    And then you -- and then below that is you to

20   Elliot Mcintosh.  Now, first, who is Elliot Mcintosh?

21       A    He's -- he works in Counsel's office.

22       Q    Okay.  And is that the people who do the

23   warrant lift?

24       A    No.  No, he is like Rose attorney, so he is

25   who we would get direction from before we would do

1    anything.

2         Q    Okay.  Got it.  So maybe just be clear with

3    names, so I can maybe have some luck pulling up the

4    right exhibit.  Who specifically would at counsel's

5    office be handling the warrant lift and sending it to

6    the person who needs to put it into the system?

7         A    Can you repeat the question?  I'm sorry.

8         Q    So if I'm understanding the process correctly,

9    somebody at counsel's office needs to talk to the office

10   in Albany that actually lifts the warrant in the system.

11   Who is it at counsel's office and which counsel's

12   office?

13        A    So, again, for internal operations.  So Elliot

14   Mcintosh or someone of his similar title would forward

15   those writs, if you will, to -- the person's name is

16   Tammi Cafariella and she is the head analyst and she is

17   the one who closes warrants.

18        Q    Okay.  So this is Tammi Cafariella?

19        A    Yes.

20        Q    How do you spell that?

21        A    C-A-F -- I forget her name.  C-A-F-E -- I

22   don't know.  C-A-F-F-E-R-I-L-L-A?

23        Q    Okay.  Hold on for one second.  Okay.  So

24   would it be C-A-F-A-R-I-E-L-L-A?

25        A    Yeah, sounds right.

1    closed in the system.

2         Q    Right.

3         A    Right.  That's why I would reach out to Tammi,

4    because she is the one who closes warrants.

5         Q    Right.  And I'm just wondering, so we know

6    from this email, that she got notification about this

7    warrant on March 23rd, right?

8         A    By way of my email, correct.

9         Q    Right.  Okay.  So how would we determine

10   whether or not she had taken the next step?

11        A    By her response to the email.

12        Q    Got you.  Is there also a -- all right, well,

13   let's move to the next email then.

14                   MR. RICKNER:  All right.  Can we mark

15   this?  I believe it's Exhibit 15.

16        (Exhibit 15 marked for identification.)

17   BY MR. RICKNER:

18        Q    So this is Ms. Cafariella's response; is that

19   correct?  It says --

20        A    Yes.

21        Q    -- "I did not Writ's go to Counsel's first."

22        A    Correct.

23        Q    Which counsel's would that be?

24        A    Elliot Mcintosh's office.

25        Q    Okay.  But at this point, is you sending it to

1   her enough for her to change it in the system, or would

2   it have to come from Mr. Mcintosh?

3       A   It would have to come from Counsel's office.

4       Q   Okay.

5       A   We could not proceed unless we got something

6   from Counsel's office.

7       (Pause.)

8               MR. RICKNER:  One moment.

9   BY MR. RICKNER:

10      Q   So is there a particular database or something

11  else where you can go to actually check to see if the

12  writ has been updated correctly through -- in the

13  system?

14      A   No.

15      Q   So you would have to get -- in order to find

16  out that the warrant had been lifted, you'd need to get

17  an email from somebody like Tammi Cafariella that said

18  the warrant had been lifted?

19      A   No, lifted comes from my office.  Ms.

20  Cafariella's office would close the warrant.

21      Q   Okay.  I apologize.

22      A   Thereby making it -- making it ready to be

23  lifted.

24      Q   Got it.  Okay.  I see the difference.  So is

25  there a system you can look up to see if the -- if the

1    go.

2         (Exhibit 16 marked for identification.)

3    BY MR. RICKNER:

4         Q    It took  -- can you see this exhibit?

5         A    Yes, I can.

6         Q    I can -- I can see your hands.  It looks --

7         A    I'm sorry, yes.

8         Q    -- like you're maybe on an -- are you on an

9    iPad?

10        A    Yes, I am.

11        Q    Okay.  So you're scrolling through.  You've

12   seen this exhibit?

13        A    Yes.

14        Q    Okay.  So at this point, Tammi Cafariella is

15   reporting to you and multiple other people that this

16   warrant has been closed, right?

17        A    Right.

18        Q    Okay.  So now what would the next step be for

19   releasing Mr. Rodriguez?

20        A    Give him a release interview.  A release

21   interview and then process the -- schedule a release

22   interview.

23        Q    Okay.  Now, at some point at this time, did

24   you go out sick?

25        A    Yes.

1     Q    Okay.  When was that?  What dates were those?

2     A    When I left on March 20 -- I went out on March

3    23rd, and I didn't come back until April 7th.

4     Q    Okay.  Now I'm going to close this one for

5    all.  Were you still monitoring your emails?

6     A    No, I was not.

7     Q    Okay.  Let me step back.  So who would be

8    responsible for scheduling the release interview?

9     A    Well, his information would have been -- my

10   office would have been responsible for that.  Once we

11   receive the information, it's given to clerical to put

12   the incarcerated person's name on an interview list,

13   then a packet is given to a parole officer to work up

14   the case.

15    Q    Okay.  And do you know what day that Mr.

16   Rodriguez was put on the interview list?

17    A    He was scheduled for Tuesday, the --

18    Q    That was 24th?

19    A    The 24th, yes.

20    Q    Do you know if that actually happened?

21    A    Well, I now know that it did not happen.

22    Q    Okay.

23    A    I later found out it didn't happen.

24    Q    Okay.  Why didn't it happen?

25    A    I went out sick, COVID.  And once my team

1   learned that I had COVID, everybody quarantined and no

2   one came in.

3        Q    Okay.  Was anyone doing release interviews

4   that week?

5        A    I later -- I mean, I've learned since that

6   later in the week, there was a parole officer, Sheila

7   Bailey, who had been out previously, and she actually

8   came back to work and tried to process out individuals.

9        Q    Okay.  And were you in communication with Ms.

10  Bailey?

11       A    I was not.

12       Q    Do you know if anyone was in communication

13  with Ms. Bailey?

14       A    I believe Ms. Lucas was.

15       Q    Okay.  And was Ms. Lucas sort of dictating to

16  her which people should be taking priority for release?

17            MS. CHA:  Objection.  You can answer,

18  Antoinette.

19            THE WITNESS:  Okay.  I'm not sure.

20  BY MR. RICKNER:

21       Q    Okay.  Now, with respect to actually releasing

22  Mr. Rodriguez, would it be correct to say that all Ms.

23  Bailey had to do was do the interview and sign this

24  warrant lift card that we discussed before?

25       A    Yes.

1      Q    Okay.  And with respect to writs of habeas

2  corpus, are they given any particular priority?

3      A    They are.

4      Q    Okay.  So just to be clear, if somebody has a

5  writ of habeas corpus they're supposed to -- and there

6  are no other holds on their file, they're supposed to be

7  released first, if possible, right?

8      A    If possible.

9      Q    Okay.  And what would prevent them from being

10  released first?

11      A    If there were special conditions to their

12  release, Mister -- in this particular case, he was

13  listed as a discretionary sex offender.  Say our sex

14  offenders are mandatory escorts from incarceration to

15  their residence, as a discretionary, it's up to the

16  field to determine whether or not they will or will not

17  provide escort.

18      Q    But to be clear, Mr. Rodriguez did not need an

19  escort; is that right?

20      A    Right.  They want -- he wind up not needing.

21  Exactly.

22      Q    Okay.  And you found that out on the 23rd?

23      A    I do not believe I did.

24      Q    Or previously?  Hold on.  Let me just have to

25  find it.  There we go.  Okay.  This was previously

```
 1                    THE WITNESS:  No, I do not.

 2   BY MR. RICKNER:

 3       Q    Do you know why he wasn't interviewed on the

 4   27th?

 5                    MS. CHA:  Objection.

 6                    THE WITNESS:  I do not.

 7   BY MR. RICKNER:

 8       Q    Who would have been in a position to determine

 9   whether or not he was interviewed on either the 26th or

10   27th?

11                    MS. CHA:  Objection.

12                    THE WITNESS:  Who -- could you repeat the

13   question?

14   BY MR. RICKNER:

15       Q    Who was in charge?  Who would have made the

16   decision to interview him or not interview him on the

17   26th or 27th?

18                    A    I'm not sure who was in charge?

19                    Q    Typically, who would be the -- what would

20   at least be the title of the person who was in charge?

21       A    A senior parole officer would have been in

22   charge, but I was out with COVID.  There is no other

23   senior parole officer assigned to DDOI.  So it was --

24   whomever -- who was there?  And I do know that PO Bailey

25   was there.
```

1        Q    Okay.  So to be correct -- to be clear, you

2   were the only senior parole officer at that station?

3        A    That's correct.

4        Q    Okay.  So when you go out sick, in any -- or

5   you're on vacation or anything else, who takes your

6   place?

7        A    Usually a -- a senior parole -- the most

8   senior --

9                MR. RICKNER:  There we go, crap.  Okay,

10  well.

11               MS. CHA:  I'm sure she'll be on -- back

12  on momentarily.

13               MR. RICKNER:  Oh, yeah.  No, no, it's

14  fine.  I'm hoping Ms. Gonzalez has --

15               THE REPORTER:  Can we go off the record?

16               MR. RICKNER:  Yes, please.

17      (Off the record.)

18               THE REPORTER:  We're back on the record,

19  11:07 a.m.

20               THE WITNESS:  Okay.

21               MR. RICKNER:  Okay.  So we didn't get a -

22  - could I actually just get a readback on the last

23  question?

24      (Readback as requested.)

25               THE WITNESS:  Well, normally when I --

1  when I go, I haven't gone out sick prior to the COVID,

2  but when I go on vacation, it's usually my bureau chief

3  who oversees the bureau.

4  BY MR. RICKNER:

5      Q    And who is your bureau chief?

6      A    At the time, it was Edward Delrio.

7      Q    And was Mr. Delrio effectively in charge of

8  DDOI while you were -- and taking over your duties while

9  you were out sick?

10     A    Mr. Delrio was actually on vacation.

11     Q    Bad luck on his part.  So who did take your

12  place and take over your duties?

13     A    What I learned, after returning back from

14  COVID, Ms. Rose -- Deputy Chief Rose Williams was

15  assigned to cover Rikers Island.

16     Q    Okay.  And to your knowledge, what was Sheila

17  Bailey's -- Sheila Bailey's role?

18     A    Her role would be to interview -- interview

19  parole -- incarcerated persons and get them for -- ready

20  for release.

21     Q    Okay.  But with respect to deciding who gets

22  an interview on a specific day, who held -- who had that

23  position?

24     A    Well, I would imagine that Rose Williams would

25  assist PO Bailey in getting that done, but there would

1   be -- we would have had --

2        (Off the record.)

3             THE REPORTER:  Okay.  We are back on the

4   record at 11:10 a.m.

5        (Readback as requested.)

6             MS. CHA:  I'm going to note my objection.

7   Sorry, I know it's a readback.

8             THE WITNESS:  So the question is in

9   general or during that particular time?

10  BY MR. RICKNER:

11       Q    During that particular time.

12       A    Well, Deputy Chief Rose Williams --

13       Q    Okay.

14       A    -- in conjunction with PO Bailey, would have

15  been the ones who determine who gets released.  I mean,

16  whose -- whose interview gets taken care of based on

17  probably the work that was already there at DDOI.

18       Q    What do you mean the work that was already

19  there?

20       A    So we would already have had folders for

21  people who were scheduled to be released on the 23rd,

22  the 24th, the 25th, the 26th, so based on those -- that

23  work that was probably already there, those folders that

24  were already ready for those particular days, those

25  would have got done, and then in addition, I guess, to

1    scheduling anything else that -- that was coming in.

2        Q    Okay.  One second.

3                 MR. RICKNER:  Let me close out this

4    exhibit.  Share with all, and you can place -- you can

5    mark this as the next exhibit, please.  Yes, I know

6    there's a big redacted part, but we're going to just

7    scroll down.

8        (Exhibit 17 marked for identification.)

9    BY MR. RICKNER:

10       Q    So can you see the, I believe we have it

11   marked as Exhibit 17 on the screen?  It's an email from

12   Dolly S. Vega.

13       A    Yes.

14       Q    And it says, "Good morning, ARD Officer

15   (sic)," and it indicates that the release interview and

16   Warrant Lift were processed the prior day, meaning the

17   26th; is that right?

18       A    I'm sorry, I was reading.  I'm sorry, what's

19   your question?

20       Q    Please, read -- read the exhibit.  I want you

21   to be familiar with at least the --

22       A    Okay.

23       Q    -- the latter emails in the chain.

24       (Pause.)

25                 THE WITNESS:  Okay.  I'm done.