## Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    _____

4    MODESTO RODRIGUEZ,

5        Plaintiff,

6    v.                Case No:

7    THE CITY OF NEW YORK, WARDEN STEVEN    21-CV-8565 (CM)

8    BASTIAN, OFFICER MICHELLE GONZALEZ

9    ANTOINETTE DOUGLAS, AND LACHONDA

10   LUCAS,

11       Defendants.

12   _____

13            DEPOSITION

14   _____

15

16   WITNESS:     LACHONDA LUCAS

17   DATE:        Wednesday, October 18, 2023

18   START TIME:     10:31 a.m., ET

19   END TIME:       11:55 a.m., ET

20   REMOTE LOCATION:   Remote Legal platform

21   REPORTER:       Olivia Wilson, CER-1600

22   JOB NO.:        20394

23

24

25

## Page 2

1              A P P E A R A N C E S

2    RICKNER, PLLC

3    14 Wall Street, Suite 1603

4    New York, New York 10005

5    By:  ROBERT RICKNER, ESQUIRE

6       rob@ricknerpllc.com

7    Appearing for Plaintiff

8

9    NEW YORK CITY LAW DEPARTMENT

10   100 Church Street

11   New York, New York 10007

12   By:  JACQUELYN DAINOW, ESQUIRE

13      jadainow@law.nyc.gov

14   Appearing for Defendant, DOCCS

15

16   STATE OF NEW YORK ATTORNEY GENERAL

17   28 Liberty Street

18   New York, New York 10005

19   By:  GEEWON CHA, ESQUIRE

20      geewon.cha@ag.ny.gov

21   Appearing for Defendants, Lachonda Lucas,

22   Antoinette Douglas, Michelle Gonzalez

23   ALSO PRESENT:

24   Sarah Schroeter, Notary Public

25   Sam Kim, Legal Intern

## Page 3

1       I N D E X  O F  T E S T I M O N Y

2

3    EXAMINATION OF LACHONDA LUCAS:        PAGE

4       By Mr. Rickner              10

5       By Ms. Dainow               53

6       By Mr. Rickner              54

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 4

1       I N D E X  O F  E X H I B I T S

2          (available for download)

3

4    EXHIBIT  DESCRIPTION                PAGE

5    1     State Defendant's 103 to 104      22

6    2     State Defendant's 151 to 152      24

7    3     State Defendant's 142 to 143      27

8    4     State Defendant's 132 to 134      31

9    5     State Defendant's 126 to 127      35

10   6     State Defendant's 117 to 118      39

11   7     State Defendant's 821 to 822      40

12   8     Warrant                  43

13   9     Memorandum                47

14   10    State Defendant's 296 to 297      50

15   11    Responses                52

16

17

18

19

20

21

22

23

24

25

Page 5

1      FEDERAL STIPULATIONS

2

3      IT IS HEREBY STIPULATED AND AGREED by and

4 between the attorneys for the respective parties that

5 the presence of the Referee be waived;

6      IT IS FURTHER STIPULATED AND AGREED that all

7 objections, except as to form, are reserved until the

8 time of trial;

9      IT IS FURTHER STIPULATED AND AGREED that this

10 deposition may be utilized for all purposes as provided

11 by the Federal Rules of Civil Procedure;

12      AND IT IS FURTHER STIPULATED AND AGREED that all

13 rights provided to all parties by the Federal Rules of

14 Civil Procedure shall not be deemed waived and the

15 appropriate sections of the Federal Rules of Civil

16 Procedure shall be controlling with respect thereto.

17

18

19

20

21

22

23

24

25

Page 6

1      FEDERAL REMOTE STIPULATIONS

2

3      IT IS HEREBY STIPULATED, by and between the

4 attorneys of record for all parties to the above-

5 entitled action, that:

6      Pursuant to Rule 30(b)(4) of the Federal Rules

7 of Civil Procedure, this deposition will be conducted by

8 remote videoconference with the oath being administered

9 remotely and a court reporter creating an accurate

10 written record; that, if necessary, the parties agree

11 that each witness can be identified with picture

12 identification;

13      No attorney, nor any party or witness, shall

14 capture any still photographs, nor record, by video or

15 audio, any part of these deposition proceedings.

16      Each attorney agrees to instruct their witness

17 that there is to be no communication with anyone outside

18 of the identified and participating group, by chat,

19 text, email, or other means during the deposition;

20      There shall be no other person in the room

21 with the witness during their deposition;

22      Any phone or electronic device in the room

23 with a witness shall be identified and not read,

24 referred to, or otherwise used during the witness'

25 deposition, unless agreed to by all counsel on record.

Page 7

1      P R O C E E D I N G S

2      THE REPORTER:  Okay.  Good morning.  We

3 are now on the record.  Today's day is October 18, 2023,

4 and the time is approximately 10:31 a.m. Eastern Time.

5 My name is Olivia Wilson, and I am the officer

6 designated by Remote Legal, 381 Park Avenue South, New

7 York, New York to take the record of this proceeding.

8      This is the deposition of Lachonda Lucas,

9 taken in the matter of Rodriguez versus the City of New

10 York, et al., Index Number 21-CV-8565CM filed in the

11 United States District Court, Southern District of New

12 York.

13      Will all counsel please identify

14 themselves for the record, starting with the noticing

15 attorney, and state who they represent?

16      MR. RICKNER:  Rob Rickner for the

17 plaintiff, Modesto Rodriguez.  Rickner, PLLC.  Good

18 morning.

19      MS. DAINOW:  Good morning.  Jacquelyn

20 Dainow from the Office of the Corporation Counsel.  I

21 represent the City of New York.

22      MS. CHA:  Good morning.  Gee Won Cha,

23 Assistant Attorney General Gee Won Cha from the New York

24 State Attorney General's Office representing Defendants

25 Lachonda Lucas, Antoinette Douglas, Michelle Gonzalez in

Page 8

1 this matter.  And also present is Sam Kim, a legal

2 intern for the Office of Attorney General.

3      THE REPORTER:  Would the notary please

4 identify themselves for the record?

5      THE NOTARY PUBLIC:  Good morning.  My

6 name is Sarah Schroeter.  I'm a notary public for Remote

7 Legal.

8      THE REPORTER:  This deposition is being

9 taken remotely on behalf of the plaintiff and is being

10 conducted pursuant to the procedural rules and laws of

11 the state which govern this matter.

12      As such, all parties agree to this means

13 of capturing the official record, which may include

14 recording by audio or audiovisual means, and agree

15 not to oppose admission of this proceeding on the basis

16 of the personnel or method by which the testimony in

17 this proceeding was captured.  Do the parties so

18 stipulate?

19      MR. RICKNER:  Plaintiff certainly does.

20      MS. DAINOW:  So stipulated.

21      MS. CHA:  So stipulated.

22      THE REPORTER:  Would the notary please

23 swear the witness?

24      THE NOTARY PUBLIC:  Good morning, Ms.

25 Lucas.

## Page 9

1    MS. LUCAS:  Good morning.

2        THE NOTARY PUBLIC:  Would you please

3 state and spell your name for the record?

4        MS. LUCAS:  Lachonda Lucas.  L as in

5 Larry, A as in apple, C as in Charlie, H as in Harry, O

6 as in Oscar, N as in Nancy, D as in David, A as in

7 apple.  Last name Lucas, L as in Larry, U as in

8 umbrella, C as in cat, A as in apple, S as in Sam.

9        THE NOTARY PUBLIC:  Thank you.  Ms.

10 Lucas, would you please raise your right hand?

11        Do you swear or affirm that the testimony

12 you are about to give will be the truth, the whole

13 truth, and nothing but the truth?

14        MS. LUCAS:  Yes.

15        THE NOTARY PUBLIC:  Thank you.

16        MS. LUCAS:  I do.

17 WHEREUPON,

18        L A C H O N D A   L U C A S,

19 having been called as a witness, being duly sworn by the

20 notary public present, testified as follows:

21        THE NOTARY PUBLIC:  Thank you.

22        THE REPORTER:  Thank you.  Counsel you

23 may begin.

24        MR. RICKNER:  Thank you very much.

25        EXAMINATION

## Page 10

1 BY MR. RICKNER:

2    Q    Good morning, Ms. Lucas.  Have you ever had

3 your deposition --

4    A    Good morning.  Sorry.

5    Q    Have you ever had your deposition taken

6 before?

7    A    No, I have not.

8    Q    Okay.  I'm sure your counsel went over the

9 ground rules, but I'm just going to do it one more time

10 for the record.  The first one is, and this can be

11 difficult because I ask these long and rambling

12 questions.  You may know exactly where I'm going, but

13 please don't jump in until I'm finished my question.  So

14 we have a nice clear record question and answer.

15        Can you do that for me?

16    A    Yes, sir.

17    Q    Now you're testifying from an office over

18 videoconference, but understand it's the same rules as

19 though you're testifying in court, meaning you have to

20 tell the truth, the whole truth, and nothing but the

21 truth.  Can you do that for me?

22    A    Yes, sir.

23    Q    I know that we're on video, although it's not

24 being recorded, the court reporter can't take down nods

25 of the head or gestures or if you demonstrate how long

## Page 11

1 something is with your hands, you have to use words.

2 Can you do that for me?

3    A    Yes, sir.

4    Q    Thank you very much.  Now, you may want to

5 take a break and that's fine, but the rule is you've got

6 to wait until we're finished the question and answer

7 that's being posed and then you can take a break

8 afterwards.  Can you do that for me?

9    A    Yes, sir.

10    Q    Have you taken any medication or drugs or

11 anything else today that would impair your memory or in

12 the last 24 hours?

13    A    No, sir.

14    Q    Is there any medical reason besides the

15 ordinary passage of time that you can't give full and

16 complete testimony today?

17    A    No, sir.

18    Q    Okay.  Have you ever testified under oath?

19    A    Yes, I have.

20    Q    Okay.  Would that be in the course of parole

21 proceedings, for example?

22    A    Parole proceedings as well as in the course of

23 criminal trial.

24    Q    Okay.  And during either the parole

25 proceedings or the criminal trial, were you ever

## Page 12

1 impeached with your prior statements or testimony?

2    A    No, sir.

3    Q    Okay.  Did anybody ever question you about,

4 for example, testimony that you had provided earlier in

5 comparison to testimony that you're provided on the

6 stand?

7    A    No, sir.

8    Q    And how many times do you think you've

9 testified in court?

10    A    Once.

11    Q    Okay.  And how many times --

12    A    Outside of -- once outside of parole

13 proceedings.

14    Q    Yes.  Thank you.  And how many times do you

15 think you've testified in parole?

16    A    I have no idea because one of my positions was

17 that of the parole revocation specialist as well as

18 being a PO for seven years.  So I have no idea how many

19 proceedings.

20    Q    Is it fair to say hundreds?

21    A    Maybe.

22    Q    Okay.  And during those proceedings, were your

23 -- was your testimony taken down by a court reporter?

24    A    Yes.

25    Q    Okay.  And through that experience, is it fair

## Page 13

1 to say that you understand how important it is to give

2 clear and accurate responses when you're on the record

3 with a court reporter?

4    A   Yes.

5    Q   Now I'm just going to sort of try to skip

6 through your history quickly.  What year did you

7 graduate high school?

8    A   Oh, let me think.  Give me one second.  I

9 didn't know you were going to ask me that.

10   Q   This isn't usually a trick question.

11   A   I don't remember.  Hold on.  I think I know,

12 but I don't want to give false --

13   Q   This is my way of asking how old you are

14 without actually asking how old you are, but.

15   A   I think it was '94.

16   Q   All right.  So did you go to college?

17   A   Yes, I did.

18   Q   Did you graduate?

19   A   Yes, I did.

20   Q   What year did you graduate and what was your

21 degree?

22   A   I believe I graduated from college in 1998

23 with a bachelor's in human relations psychology.

24   Q   When did you start working at the Department

25 of Correction and Community Supervision, or its

## Page 14

1 predecessor, either parole or DOC?

2    A   July 2007.

3    Q   Okay.  Now, between 1994 and July of 2007, did

4 you have any job involving law enforcement or parole or

5 something else?

6    A   No.

7    Q   Okay.  So July of 2007 were you working for

8 the Department of Parole or the Department of

9 Correction?

10   A   I was working for Division of Parole.

11   Q   Division of Parole, excuse me.

12   A   Yes, sir.

13   Q   And when did that merge with the Department of

14 Correction?

15   A   I don't remember.  But I do know it was before

16 2013.

17   Q   Yes, I think that's right.  Okay.  So when you

18 started at the Division of Parole, what was your job

19 title?

20   A   Parole officer.

21   Q   Okay.  How long were you a parole officer?

22   A   I was a parole officer from 2007 until January

23 2015.

24   Q   Okay.  And in 2015 did you receive a promotion

25 or a new title or something similar?

## Page 15

1    A   Yes, sir.

2    Q   Okay.  What was that?

3    A   Parole revocation specialist.

4    Q   And what does a parole revocation specialist

5 do?

6    A   The parole revocation specialist represents

7 the department in parole revocation hearings when a

8 release has been deemed to be in violation of releasee

9 conditions.

10   Q   Okay.  And how long did you have that

11 position?

12   A   About three and a half years.

13   Q   And so that brings us to maybe sometime in

14 late 2018?

15   A   June, 2018.

16   Q   Okay.  Mid-2018.  June, 2018.

17   A   Yes.

18   Q   What was your next position?

19   A   Parole revocation specialist 2.

20   Q   Okay.  And how did your job responsibilities

21 change?

22   A   As the PRS 2, I supervised the PRS staff that

23 were presenting cases in the revocation process.

24   Q   Okay.  And how long did you hold that position

25 or do you still hold that position?

## Page 16

1    A   I was in that position for about three and a

2 half years until April of 2022.

3    Q   Okay.  So in March of 2020, you were a parole

4 revocation specialist 2?

5    A   Yes, sir.

6    Q   And where were you stationed?  Meaning where

7 were you physically every day and around let's say

8 February and March of 2020?

9    A   I'm not -- I don't understand your question.

10   Q   Did you work in Albany?  Did you work in

11 Rikers Island?  Did you work in an office in Manhattan,

12 someplace else?

13   A   And you're saying for February as well as

14 March?

15   Q   Yeah.

16   A   Well, in February I would have been --

17 February, early March I would have been working in

18 between Rikers Island and the Manhattan office.

19   Q   And was there a period of time when you began

20 working remotely?

21   A   No, sir.

22   Q   Okay.  Then after mid-March of 2020, where

23 were you work -- going to work every day?

24   A   The Manhattan office.

25   Q   Okay.  So you stopped going to Rikers Island?

Never mind, let me do proper.

Page 17

1  A  Yes.
2  Q  Okay.  Now, if -- I'd just like to sort of
3  walk through the procedure here.  Do you understand what
4  a writ of habeas corpus is?
5  A  Yes.
6  Q  What's a writ of habeas corpus to your
7  understanding?
8  A  To my understanding, it is a document that
9  orders that a person be released from custody.
10  Q  Okay.  Let's just say from, you know, March of
11  2019 to March of 2020, about how often in your work
12  would you see a writ of habeas corpus?
13  A  I -- I can't really answer that.  I don't
14  know.
15  Q  Would you say it's more than 10?
16  A  I really don't know.  I can't really say.
17  Q  Do you see them once a week?
18  A  I have -- I mean that -- that is such a
19  general question, I really can't say because you are
20  asking me from 2019 to 2020, how many did I see.  I
21  really don't know.
22  Q  I'm just wonder -- so in -- so there are
23  multiple different ways that people be -- will be
24  released from custody when they're part of the parole
25  system; is that right?

Page 18

1  A  That is correct.
2  Q  Some people finish their sentences, right?
3  A  Yes.
4  Q  And some people reach a plea deal for
5  something like time served and then they're released
6  afterwards, right?
7  A  That is correct.
8  Q  And some people end up not being on parole; is
9  that right?
10  A  That is correct.
11  Q  Okay.  Now, and habeas corpus is yet another
12  way that people are released, right?
13  A  Yes.
14  Q  So what I'm trying to understand is how often
15  is it that you see habeas corpus writs versus all of the
16  other times people get released?  Is it most of the
17  time, fairly rare, something in between?
18  A  I really don't know.  I can't really answer
19  that.
20  Q  Now, when somebody gets a writ of habeas
21  corpus from a judge, what is the procedure that now
22  DOCCS goes through to have them released?  What are all
23  of the different steps?
24  A  If a writ of habeas corpus is received and we
25  would get notification from the Board of Parole that the

Page 19

1  person has received this writ and that they should be
2  released.
3  Q  And who from the Board of Parole would notify
4  you that there was a writ?
5  A  It could be a number of different people.  It
6  could be Elliot McIntosh or someone that's -- that works
7  with him that would send that notification.
8  Q  Okay.  And once you receive that notification,
9  what's the next step?
10  A  Well, I wouldn't necessarily be the one
11  receiving it because that's not my part of the work.
12  Q  Understood.  Once the, you know, once I guess
13  your division or your group receives the writ of habeas
14  corpus, what's the next step?
15  A  Once the writ of habeas corpus is received,
16  then notification is received from the board, then DDOI
17  that is stationed on Rikers Island or it's -- DDOI
18  stands for declared delinquent of an institution.  They
19  would prep the case, review the case, and prep it to set
20  up a release interview for the releasee.
21  Q  And a release interview for the
22  releasee, what does that mean?
23  A  They would meet with the releasee and give
24  them reporting instructions and review where they're
25  going to live and review their assigned parole officer,

Page 20

1  senior parole officer, and the office to which they will
2  be reporting.
3  Q  Okay.  And what's the -- what's the typical
4  timeframe it takes to set up that meeting?
5  A  I really can't say.  I mean, it should be
6  immediate, but there are other factors that I'm sure
7  come up.
8  Q  Like what?
9  A  Like if someone requires an escort or maybe
10  just being medically unavailable.
11  Q  You mean if they're in the hospital?
12  A  Right.
13  Q  Okay.  What is an escort in this -- in the way
14  you just used it?
15  A  If someone is classified as a sex offender or
16  prior to Covid certain OMH-level cases would require
17  that a parole officer pick them up from the facility and
18  actually drive them to their approved residence.
19  Q  Oh, you mean to get them out?
20  A  Yes.
21  Q  Okay.  And do -- are people who are released
22  due to a writ of habeas corpus treated any differently
23  in this procedure that you're describing than somebody
24  who's released through some other means, like finishing
25  their sentence or something else?

1    A    I can't really answer that because this is not
2    -- that's not my part of the work.
3    Q    Okay.  Well, for your part of the work, do you
4    treat people who have received their writ of habeas
5    corpus any differently than anybody else who's being
6    released from parole?
7    A    I wouldn't be dealing with releases.
8    Q    Okay.  In March of 2020, what was your role at
9    the Department of Correction and Community Supervision?
10   In this process, what were you doing?
11   A    Specifically, what timeframe are you asking
12   about?  I'm sorry.
13   Q    Between March 19th of 2020 and the end of the
14   month.
15   A    March 19, 2020, and the end of the month, I
16   was at the Manhattan office.  If I remember correctly,
17   that was the beginning of Covid.  And while in the
18   Manhattan office, my tasks were to review all the
19   current revocation cases that we had open and to see if
20   they could be resolved so that the judges could render a
21   decision and the releasees could then be -- their names
22   could be sent to DDOI for the release interviews to be
23   conducted and they could be released from custody.
24   Q    All right.  So I'd just like to -- let's
25   figure out how to mark this.  No, that's not it.  All

1    right.  I'm going to share with the screen document
2    State Defendant's 103 to 104.
3    A    Okay.
4         MR. RICKNER:  And court reporter, which
5    is the button to mark this I always forget.
6         THE REPORTER:  Oh, I can mark it for you.
7         MR. RICKNER:  That's great.  Let's use
8    numbers and mark --
9         THE REPORTER:  Yeah.
10        MR. RICKNER:  -- this as Exhibit 1,
11   please.
12        THE REPORTER:  Sure thing.  It's marked.
13        MR. RICKNER:  Wonderful.
14   (Exhibit 1 marked for identification.)
15   BY MR. RICKNER:
16   Q    Now, I'm going to scroll down and you could
17   actually manipulate this on your screen if you want to -
18   - if you want to look back, but I'm going to hit a
19   button that's going to move you to the second page.
20   A    Okay.
21   Q    So do you see the second page?
22   A    Yes.
23   Q    Okay.  And it's -- here it says, "Subject DCJC
24   DOCCS discharges.  Discharges are paramount.  Nothing
25   could be more important at this time."  Do you see that?

1    A    Yes, sir.
2    Q    And that was being sent by Edward Delrio; is
3    that right?
4    A    Yes.
5    Q    Okay.  Who is he?
6    A    He was the -- he was my supervisor, the chief
7    of the parole violation unit, and DDOI at the time.
8    Q    Okay.  And if you see as it scrolls up,
9    eventually you were brought into this email list or
10   email chain.  Do you see that on the first page?
11   A    On the first page.  Hold on.  Yes.
12   Q    Should bounce you out.  All right.  And it
13   says, "DC Lucas will coordinate all activities from our
14   NYC office."  Do you see that?
15   A    Yes, sir.
16   Q    What did that mean?
17   A    That meant what I described earlier that I
18   would go through all the pending revocation cases and
19   those that could be resolved, I would schedule them with
20   our Administrative Law Judge, hold the cases so that
21   they could render a decision, and then compile a list to
22   be sent to DDOI for them to review the cases and to
23   process the individuals for release back to supervision.
24   Q    Okay.  I'm going to to close this exhibit out.
25   Pull up another one.

1         MR. RICKNER:  All right.  Let's mark this
2    as Exhibit 2.
3         (Exhibit 2 marked for identification.)
4    BY MR. RICKNER:
5    Q    And this is Defendant's -- State Defendant's
6    151 to 152.  Now, I'd like you to -- hold on.  I'm going
7    to bring you to the second page.  And can -- did we mark
8    this as -- yeah.  Great.  Probably you can see the first
9    email in this chain.  It's from Antoinette Douglas.  And
10   you are CC'ed on it and it's -- involves Modesto
11   Rodriguez.  And there's whole paragraph of text about
12   it; is that right?  Do you see what I'm talking about?
13   A    Yeah.
14   Q    All right.  Now, do you know why Modesto
15   Rodriguez was not scheduled for his release interview,
16   it looks like initially until March 24th?
17   A    Do I know why he wasn't scheduled for a
18   release interview until March 24th?
19   Q    Yes.
20   A    No, I wouldn't know why.
21   Q    Okay.  Do you know why you were included on
22   this email?
23   A    Because as I stated, Delrio was in charge of
24   PVU as well as DDOI and as the PRS 2 or the unofficial
25   title Deputy Chief, we were CC'ed on almost all emails.

Page 25

1    Q    Okay.  Now, were you in any way responsible at
2  this point for determining whether or not somebody
3  needed an escort?
4    A    No, sir.
5    Q    Who would decide if somebody needed an escort?
6    A    That would be part of the review that is
7  performed by DDOI staff.
8    Q    And were you involved in any way in scheduling
9  or providing a list of people for DDOI to -- you know
10  what, that was a terrible question.  I'm going to --
11  I'll do that with a different exhibit.
12        All right.  Just going up to the -- hopefully,
13  you see the top.  And this is a March 31st email.  And
14  it's determined here that Mr. Rodriguez does not require
15  an escort.  Do you see that?
16    A    Yes.
17    Q    Okay.  So if somebody does not require an
18  escort, what are the steps that DOCCS or somebody else
19  takes between having them in a jail cell and letting
20  them out the door if they don't require an escort?
21    A    The steps remain the same.  They would get a
22  release interview and then the warrant would be lifted
23  by DDOI staff.
24    Q    So my understanding is, is that the warrant
25  doesn't get lifted until the release interview?

Page 26

1    A    That's generally how it happens.  Yes.
2    Q    Well, you said it's generally how it happens.
3  Is that how it happens every time?
4    A    Well, during Covid we had situations where
5  they were released without an interview.  That's why I
6  said that's generally how it happens.
7    Q    Okay.
8    A    Outside of Covid, they would have a release
9  interview, and then after that they -- the warrant would
10  be lifted.
11    Q    Okay.  And so a warrant doesn't get lifted --
12  withdrawn.
13        Under normal circumstances, a warrant is not
14  lifted unless there's a release interview, it's a
15  requirement?
16    A    Yes.
17    Q    Okay.  And is that true regardless of how the
18  person's getting released, whether it's a writ habeas
19  corpus or something else?
20    A    I mean, if the person's being released because
21  they're no longer on supervision, then there's no reason
22  for a release interview.  But other than that
23  circumstance, they would have a release interview.
24    Q    Okay.
25    A    Under normal circumstances.

Page 27

1    Q    Got it.  I'm going to close -- close out this
2  exhibit.  There's quite a few of these emails.  All
3  right.  I am going to share this with everybody and
4  let's mark this as Exhibit 3, please.  And you can
5  scroll -- scroll through it.  You want to read this one
6  because we're going to spend a little bit of time on it.
7  Nothing is ever easy.
8    A    Sorry.  Give me one second.  Sorry about that.
9        (Exhibit 3 marked for identification.)
10  BY MR. RICKNER:
11    Q    Yeah.  So I'd like you, hopefully, we've
12  marked this one.  Yes.  Excellent.  So let's look at the
13  second page of Exhibit 3.  And this is at the, you know,
14  beginning of the chain, Edward Delrio email to you and
15  Rose Williams.  Do you see that?
16    A    Yes, sir.
17    Q    And it says -- the first line, it says, "DDOI
18  must report to the Judicial Center."  Do you see that?
19    A    Yes.
20    Q    What does that mean?
21    A    That means that the parole officers assigned
22  to DDOI on Rikers Island had to return to the building.
23    Q    Oh, is the Judicial Center part of Rikers
24  Island?
25    A    Yes, it is located on Rikers Island.

Page 28

1    Q    Okay.  And it says, "I need a list of everyone
2  scheduled to be released and should have been released.
3  I want them scheduled to be produced at the Judicial
4  Center for discharge on Thursday."  Do you see that?
5    A    Yes.
6    Q    And after that it says the number of inmates
7  produced will be limited to space, right?
8    A    Yes.
9    Q    So is it fair to say that, you know, due to
10  Covid you could only release so many incarcerated people
11  at a time, even if they were due to be released?
12    A    Yes.
13    Q    The flow-out was slower because of Covid,
14  right?
15    A    Yes.
16    Q    Okay.  And you responded, looks like about
17  3:00 p.m. on March 24th, "Would you like me to send you
18  the production list for today and tomorrow?"
19    A    Yes.
20    Q    Okay.  Then the chief said, "Consolidate both
21  lists and have them all produced tomorrow."  Do you see
22  that?
23    A    Yes.
24    Q    Now your response is, "No, can do, Chief.  Too
25  many individuals for one PO to see."  Do you see that?

Page 29

1    A   Yes.

2    Q   Okay.  So I take it to mean that you couldn't

3   have two days' worth of people being released

4   consolidated onto one list?

5    A   That was my concern because the Judicial

6   Center was closed on Monday due to someone testing

7   positive for Covid, and then it wasn't open on Tuesday,

8   which is why I was the one who had to send a production

9   list because I was in the office.

10        The concern was that one parole officer could

11   not see all the people that needed to be seen from those

12   two days on Wednesday because there was only one parole

13   officer that was not sick at the time.

14    Q   Right.  And so of the list -- well, you say 25

15   or 27, do you see that?

16    A   Yes.

17    Q   Okay.  Does that mean each day you had 25 or

18   27, or roughly all at once you had 25 or 27?

19    A   I really can't remember, but I do know that if

20   they were closed on Tuesday, the Tuesday people weren't

21   seen and then we're talking about putting them on for

22   Wednesday, where there was probably already a list for

23   Wednesday as well.

24    Q   Okay.  Now, when it came to make the list of

25   people who are going to be seen on Wednesday, who made

Page 30

1   that list?

2    A   That was our -- that was a list that already

3   existed from DDOI.

4    Q   Okay.

5    A   From days -- from, I'm sorry, from days

6   before.

7    Q   Okay.  So there's a list from days before that

8   had already been created and then you just resent it?

9    A   Yes.

10    Q   Or something else?  Okay.  Who decides who

11   goes on that list?

12    A   That's a function of DDOI as they prep the

13   cases and depending on the status they would schedule

14   release interviews and it would be sent for the

15   releasees to be produced.

16    Q   Got it.  All right.  Let me close out this

17   exhibit.  I have quite a few of these, apologies.  Just

18   give me one second.  Repeat.

19        MR. RICKNER:  Okay.  Let's mark this as

20   the next exhibit.  I believe it's 4.  And for the record

21   is, is State Defendant's 132 through 134.

22   BY MR. RICKNER:

23    Q   Now, I'm going to go down to, I guess really,

24   it's the -- the second email where it says, "Good

25   afternoon."  Do you see that?

Page 31

1    A   I don't see anything.

2        MR. RICKNER:  Oh, I forgot to share with

3   all.  Here we go.  There we go.  Now, can we mark this

4   as Exhibit 4?

5        (Exhibit 4 marked for identification.)

6   BY MR. RICKNER:

7    Q   I'm going to scroll down to the second email,

8   which is broken up across two pages where it says, "Good

9   afternoon, please see the attached revised list."  Do

10   you see that?

11    A   Yes, sir.

12   BY MR. RICKNER:

13    Q   So just to be clear, who makes -- this list is

14   made by somebody else at DOCCS besides you?

15    A   This was made at -- by the staff at DDOI.

16    Q   Okay.  And here it says Modesto Rodriguez

17   writ.  That's on the third page.  Do you see that?

18    A   Yes.

19    Q   And if you can -- okay.  And if you can't see

20   it, let me know.

21    A   No, I can see it.  Thank you.

22    Q   It says, "Assigned PO duty officer."  What

23   does that mean?

24    A   It means that when he reports he's going to

25   see the duty officer in Manhattan 6.

Page 32

1    Q   And what has been -- Manhattan 6 is the

2   Bureau?

3    A   Yes.

4    Q   And so by duty officer, it just means he's

5   going to see whoever happens to be assigned?

6    A   A duty officer is usually two POs are assigned

7   each day to be in the office with the exception of

8   report day.  And they will see anyone who makes an

9   office report.

10    Q   What -- and is this the person who's doing the

11   release interview or is this -- that's somebody

12   completely different?

13    A   This is someone completely different.

14    Q   Okay.  It says Brad H, do you see that?

15    A   Yes.

16    Q   What is Brad H?

17    A   I really don't know much about Brad H.

18    Q   Okay.  And it says here, "Warrant lifted

19   after," and it says writ.  Do you see that?

20    A   Which page are you looking at?

21    Q   I'm still on the same page as the third page

22   of the exhibit.  I can bounce you over to it.

23    A   Yes, I see it.

24    Q   All right.  So would it be correct to say that

25   on March 24th of 2020, the warrant was lifted?

Page 33

1    A   I don't know.

2    Q   Okay.

3    A   I can't say that it was lifted.

4    Q   All right.  So going back to Exhibit 4, this -

5  - at the very top, this is an email that you sent.  It

6  says, "Good afternoon.  Please produce the following

7  inmates for release interviews on Wednesday 3/25."

8    A   Yes.

9    Q   Okay.  So would it be correct to say that

10  these people were supposed to be, you know, produced for

11  these release interviews we've discussed, this would be

12  the next day, Wednesday the 25th?

13    A   That is correct.

14    Q   All right.  And who is William Newlin?

15    A   That's the captain at the Rikers Island, one

16  of the captains at Rikers Island Judicial Center.

17    Q   Okay.  And when you say a captain, do you mean

18  somebody who works for the City of New York?

19    A   Yes.

20    Q   Okay.  And as captain of the Judicial Center,

21  what is it that his -- what is his job with respect to

22  this process?

23        MS. DAINOW:  Objection.

24        MR. RICKNER:  You can answer.

25        THE WITNESS:  I don't fully know his job,

Page 34

1  but I -- what I do know is that when production is

2  requested, those lists go to the captain.

3        MR. RICKNER:  Okay.

4        THE WITNESS:  The list that DDOI would

5  formulate would be sent to the captain for the releasees

6  to be produced.

7  BY MR. RICKNER:

8    Q   Okay.  And I -- would it be fair to say that

9  the captain then looks at the list and goes and gets the

10  people to be actually transferred to the Judicial Center

11  from whatever unit they're in or part of --

12    A   I can't --

13        MS. DAINOW:  I'm sorry.  Note my

14  objection.  Thank you.

15        THE WITNESS:  I can't answer as to what

16  the captain does with the list.

17        MR. RICKNER:  Okay.

18        THE WITNESS:  That, I don't know.

19  BY MR. RICKNER:

20    Q   But just to be clear, the list on page 3 that

21  went to the captain at Rikers Island?

22        MS. DAINOW:  Objection.

23        MR. RICKNER:  There's nothing wrong with

24  that question.  You can answer.

25        THE WITNESS:  As per my email, yes, it

Page 35

1  went to the captain.

2  BY MR. RICKNER:

3    Q   Okay.  Who's Tameca, T-A-M-E-C-A, Jenkins?

4    A   She's also a captain.

5    Q   Okay.  Is she also at the Judicial Center?

6    A   Yes, she is.

7    Q   Okay.

8        MR. RICKNER:  I'm going to close out this

9  exhibit.  I'm just clearing out a few of these I'm not

10  going to use.  Okay.  Can we share this -- can we mark

11  this as Exhibit 5?

12        (Exhibit 5 marked for identification.)

13  BY MR. RICKNER:

14    Q   But before I ask about Exhibit 5, with respect

15  to the Judicial Center at Rikers Island, is that -- is

16  the security in that facility provided by the New York

17  City Department of Correction?

18        MS. DAINOW:  Objection.

19        THE WITNESS:  It is a building on Rikers

20  Island that functions much like a jail.  I don't know

21  what you mean by controlled by them, but it is a New

22  York City DOCCS building.

23  BY MR RICKNER:

24    Q   Okay.  And let me ask this maybe more plainly,

25  when there are guards there who are responsible for

Page 36

1  making sure the incarcerated people don't act up and

2  aren't dangerous and all of those sorts of things, are

3  those DOC people or those DOCCS people?  That's D-O-C-C-

4  S for the court reporter.

5        MS. DAINOW:  Note my objection.

6        THE WITNESS:  That would be City DOCCS

7  personnel.

8  BY MR. RICKNER:

9    Q   Okay.  City DOCCS, you meaning the New York

10  City Department of Correction?

11    A   Yes.

12    Q   Okay.  And when it comes to actually unlocking

13  doors and letting somebody out, is that a function

14  that's performed by employees of the New York City

15  Department of Correction?

16        MS. DAINOW:  Note my objection.

17        THE WITNESS:  Yes.

18  BY MR. RICKNER:

19    Q   And so moving to this who's -- that's Exhibit

20  5, sorry.  Which for the record is Defendant's 126 to

21  127.  Do you see the -- from the top, Rachael Bell?

22    A   Yes.

23    Q   Who is that?

24    A   She was an office assistant at -- in DDOI.

25    Q   Okay.  Who's Adam Figueroa?

Page 37

1    A    Staff -- New York City DOCCS staff and custody
2    management.
3    Q    What do you say -- when you say custody
4    management what do you mean?
5    A    That's the department that I know him to work
6    in.
7    Q    Okay.  What about Anthony Monastero?
8    A    Also New York City DOC staff.
9    Q    Okay.  And what about, actually, it's Carole
10   James, not James Carole.  Who's that?
11   A    She was also New York City DOC staff.
12   Q    Okay.  And Darwin Padilla, do you see that?
13   A    Yes.  He was also who --
14   Q    And who's that?
15   A    Sorry.  He was also NYC DOC staff.
16   Q    And Donique Sealey, who's that?
17   A    I don't know who that is.
18   Q    Okay.  How about Jason Soto?
19   A    I don't know who that is either.
20   Q    Joseph Grima?
21   A    I have no idea.
22   Q    How about Lisa Barnaby?
23   A    I don't know who that is.
24   Q    We'll skip over you.  Mark Wynter, W-Y-N-T-E-
25   R?

Page 38

1    A    I don't know who that is.
2    Q    Melissa Bailey, do you know who that is?
3    A    No.
4    Q    Piadosa Cruz?
5    A    No.
6    Q    Rabiah Gaynor, R-A-B-I-A-H?
7    A    New York City DOC staff and I believe health
8    affairs.
9    Q    Sherrie Rembert.  Do you see that?
10   A    Yes.  I want to see -- I want to say, excuse
11   me, Sherrie Rembert is from the Mayor's office.
12   Q    And Wanda Blair?
13   A    I don't know who that is.
14   Q    Okay.  And this list, the production call out
15   list from March 24, 2020, this is similar to the other
16   one we discussed at the prior exhibit, right, where it
17   lists Modesto Rodriguez as being list -- released to a
18   writ?
19   A    It's the same list.
20   Q    Yes.  Now, on March 24th I believe you
21   testified that there wasn't somebody available to do
22   interviews; is that right?
23   A    The Judicial Center was closed on March 24th.
24   Q    Okay.  Were the incarcerated people actually
25   brought to the Judicial Center only to find out it was

Page 39

1    closed or something else?
2    A    I don't know.
3    Q    Okay.
4         MR. RICKNER:  I'm going to close this
5    out.  Okay.  I'd like to mark this as -- this is Exhibit
6    6 or 7?  6, it is.  Okay.  And this for the record, this
7    is State Defendant's 117 to 118.
8         (Exhibit 6 marked for identification.)
9    BY MR. RICKNER:
10   Q    Now just going back, and I don't know if you
11   remember, was the Judicial Center open on the 25th,
12   26th, or 27th of March of 2020?
13   A    The 25th was a Wednesday.  Yes, I believe it
14   reopened on Wednesday.
15   Q    Okay.  For one moment.  So just looking at the
16   middle email, it says, "Good morning, subject will be
17   escorted on Friday, March 27th."  Do you see that?
18   A    Yes.
19   Q    Do you know why this was moved to March 27th
20   or why it would've been moved to March 27th?
21   A    I have no idea.
22   Q    Okay.  Let me close out this exhibit.  Every
23   time I pause like this, I'm actually deleting exhibits
24   and things are going faster, so it may seem like I'm
25   wasting your time, but it's the exact opposite.

Page 40

1    A    No problem.
2         MR. RICKNER:  All right.  Let's mark this
3    as Exhibit 7, please.  Oh, can we move -- yeah.  Can you
4    put it maybe in one of the big white spots just so we
5    don't cover up any of the email addresses?  Ah, perfect.
6    Thank you.
7         (Exhibit 7 marked for identification.)
8    BY MR. RICKNER:
9    Q    All right.  Looking at Exhibit 7, which for
10   the record is State Defendant's 821 to 822.  Who is
11   Lorraine McEvilley?  I'm just not saying that right.
12   Who's the person who sent this email?
13   A    Lorraine McEvilley is the, I guess, Director
14   of Legal Aid, the Parole Revocation Defense Unit.
15   Q    Okay.  And it says, adding, I guess your dep
16   meaning Deputy Lucas and Williams.  You see that?
17   A    Yes.
18   Q    All right.  Do you know why you were added or
19   would've been part of this communication chain?
20   A    Like I said before our chief's rule was that
21   the deputy chief should be added on all communication.
22   Q    Okay.  And it says here, you know, "Mr.
23   Rodriguez is still incarcerated.  He was ordered to be
24   released 3/19."  You were added.  After this email, did
25   you take any steps to have Mr. Rodriguez released from

Page 41

1  custody?

2      A   At the time of this email, my directive was to

3  work from the Manhattan office to move the cases so that

4  people could continue to be released.  My part of the

5  task was not to be orchestrating release interviews from

6  Rikers Island.

7      Q   Okay.  But just to be clear, did you take any

8  steps following receiving this email to have Mr.

9  Rodriguez released?  Did you do anything?

10     A   On the 27th?

11     Q   Or after until the date he was released.

12     A   Well, eventually I did do something because

13  when I was next notified about Mr. Rodriguez, I was the

14  only one at work.

15     Q   And what did you do?

16     A   I -- when I received notification that he was

17  still in custody, I reached out to DDOI to have them

18  look into the case to find out what was going on.

19     Q   Okay.  And what did DDOI tell you was going

20  on?

21     A   I don't recall her telling me, "What was going

22  on."  I told her to look at it and because that is her

23  normal task, she knew that if she had received all the

24  information she needed and his warrant needed to be

25  lifted, she would follow through with what needed to be

Page 42

1  done on his case.

2      Q   Who did you speak to?

3      A   PO Sheila Bailey.

4      Q   Do you know when you made this phone call?

5      A   I spoke to her on the 31st when I received an

6  email from, I believe senior parole officer Jacqueline

7  Kennedy of Manhattan 6.

8      Q   Do you recall that phone call to DDOI

9  informing him that Mr. Rodriguez was still incarcerated

10  resulted in Mr. Rodriguez's release?

11     A   Yes.

12     Q   Okay.  Why didn't you make that phone call

13  earlier?

14     A   Because as I stated before, that was not my

15  task that I was assigned to perform.  I was assigned to

16  hold hearings all day and compile lists of people who

17  needed to be interviewed and released.  And I was

18  located in the Manhattan office.  We don't do discharges

19  from the Manhattan office, and there were staff at

20  Rikers Island that was assigned to do discharges.

21     Q   I'm going to close out this exhibit.

22          MR. RICKNER:  Actually, you know what

23  we've been going about an hour, and I don't actually

24  have a ton left, but I'd like to take, you know, just

25  take five for myself if everybody else is okay with

Page 43

1  that, and come back, like, let's say right at the right

2  11:31, 32.

3          MS. DAINOW:  Sure.

4          MS. CHA:  Yes.

5          THE REPORTER:  Going off the record at

6  11:26 a.m. Eastern Time.

7          (Off the record.)

8          THE REPORTER:  All right.  We're back on

9  the record at 11:32 a.m. Eastern Time.

10          MR. RICKNER:  Okay.  Next exhibit,

11  sharing with all, we mark this.  This is -- put it in

12  the white part if you don't mind.  Yeah.  Thanks.  As

13  State Defendant 79.

14          (Exhibit 8 marked for identification.)

15  BY MR. RICKNER:

16     Q   Ms. Lucas, can you tell me what this is?

17     A   (Indiscernible - audio disruption.)

18          MR. RICKNER:  Okay.  That didn't work.

19          THE REPORTER:  Let's go off the record to

20  fix this real quick if that's okay.

21          MR. RICKNER:  I think Ms. Lucas maybe you

22  logged off and you logged on again or something because

23  you just --

24          (Off the record.)

25          THE REPORTER:  Okay.  We are back on the

Page 44

1  record at 11:34 a.m. Eastern Time.

2  BY MR. RICKNER:

3      Q   Now, Ms. Lucas, can you tell me what is shown

4  on Exhibit 8?

5      A   This is the warrant summary screen.

6      Q   Okay.  And what is the warrant summary screen?

7      A   When a releasee is in the revocation process

8  and a parole warrant is issued, this screen tells the

9  information regarding the date for his preliminary

10  hearing as well as his final hearing and who the case is

11  assigned to.

12     Q   Okay.  Is it fair to say that this is part of

13  a database that you can access?

14     A   Yes.

15     Q   And this is January 23rd.  So it's before the

16  writ was issued, but after the writ was issued, would

17  this screen state that a writ of habeas corpus had been

18  granted?

19     A   I'm not sure.  No, it wouldn't state that.

20     Q   Would it state that the -- once the warrant

21  was lifted, would it state that the warrant had been

22  lifted?

23     A   It would -- it would change from active to --

24  it -- scratch that.  I'm sorry.  The closure reason

25  might say something like process canceled.

Page 45

1  Q   Okay.  Would it be correct to say that once
2  the warrant is lifted on this screen, you could actually
3  see that the warrant had been lifted?
4  A   No, that's not accurate.  Somebody has to put
5  information into the system for this screen to change.
6  Q   Oh, okay.  All right.  So once somebody enters
7  into the system that the warrant has been lifted, then
8  it would show that the warrant has been lifted.
9  A   Again, it would say where it says REC status
10 or record status instead of active, it would say closed.
11 That's the third line.  And then on the right-hand
12 column towards the bottom, it would have the date that
13 it was closed and the closure reason.
14 Q   Okay.
15 A   If he got a writ -- sorry.
16 Q   I'm sorry.  Please finish.
17 A   If he received the writ, it probably would say
18 process canceled.
19 Q   Okay.
20 A   It would not say the words writ.  It would not
21 say that.
22 Q   Okay.  Now who updates the information, once a
23 warrant's been lifted, who in the DOCCS is responsible
24 for updating this computer system?
25 A   I really can't answer that.

Page 46

1  Q   Okay.  Who has access to this computer system?
2  A   DOCCS personnel.
3  Q   Anybody else?
4  A   Depending on -- depending on your title.
5  Q   And what -- I'm sorry, what is the name of
6  this system again, the database?
7  A   I think it's Case Management System, CMS.  We
8  call it CMS for short.
9  Q   Now, with respects to warrants being lifted,
10 are there any other systems in place at DOCCS, like
11 other databases where you could check to see if a
12 warrant was lifted?
13 A   I wouldn't know that because I don't lift
14 warrants.  I don't have that ability.
15 Q   Okay.  And here it says your name PRS 2 Lucas,
16 Lachonda.  Do you see that?
17 A   Yes, I do.
18 Q   Why are you listed here?
19 A   Because I was the supervisor of the parole
20 revocation specialist that was presiding over the case
21 prior to the writ.
22 Q   And who was the parole revocation specialist
23 who's provided -- presiding over it?
24 A   Russell Marquis.
25 Q   Okay.

Page 47

1  MR. RICKNER:  Close this.  All right.
2  I'd like to mark this one as Exhibit 9.  You can put it
3  at the bottom, probably make it a little bigger.
4  (Exhibit 9 marked for identification.)
5  BY MR. RICKNER:
6  Q   All right.  Do you see this memorandum?
7  A   Yes.
8  Q   Now, do you see the instructions provided
9  regarding the mandatory termination of sentence for Mr.
10 Rodriguez?
11 A   I can't see anything other than the top.
12 Q   Really?  How about now?
13 A   Here we go.
14 Q   Can you see like the text of this one?  It
15 shouldn't be any different than it is on my screen.
16 A   I see part of it, yes.
17 Q   Okay.  Well, can you see the text of the
18 mandatory termination of sentence, and then there's two
19 paragraphs below?
20 A   It's cut off (indiscernible - audio
21 disruption).  I can't see it.
22 Q   How about now?  Can you see the text?
23 A   Yes.
24 Q   Oh, you went robot on us again?
25 A   Yes, I can see it.

Page 48

1  Q   Okay.  Good.  All right.  So you see there's
2  two paragraphs underneath mandatory termination of
3  sentence?
4  A   Yes.
5  Q   What does this mean?
6  A   This means that there's a date coming out
7  where the field staff would have to complete the report
8  that's attached to determine whether or not releasee
9  would be eligible for early release.
10 MR. RICKNER:  All right.  We're not
11 getting you.  Can you log -- I think we're going to have
12 to do a log off and a log on again.  You just went
13 robot.
14 THE REPORTER:  Okay.  One second.
15 (Off the record.)
16 THE REPORTER:  We're back on the record
17 at 11:43 a.m. Eastern Time.
18 BY MR. RICKNER:
19 Q   Okay.  And so just for the record, what is --
20 what is this memorandum instructing field staff to do?
21 A   To complete the mandatory termination of
22 sentence worksheet prior to 5/1/2020 to determine if the
23 releasee would be granted release, a merit release.
24 Q   And that's a merit release from parole?
25 A   No, hold on.  I'm sorry.  I'm sorry.  Wrong

Page 49

1 form. They would have to complete the form to
2 determine, I can't -- it's not letting me --
3 Q You should be able to actually move it around
4 yourself as well.
5 A Now, I can. Oh, they -- this, I'm sorry, this
6 is the -- that's a different form. They would have to
7 complete the attached form and send it to quality
8 control no later than, like it says, five days after the
9 MTS date, which here would be 5/1/2020.
10 Q So what does that mean with respect to Mr.
11 Rodriguez's parole?
12 A That there was a portion of his sentence that
13 would be terminated as of that date.
14 Q He was on lifetime parole at the time. I'll
15 represent that to you. So would this mean that he would
16 be off lifetime parole if he was able to successfully go
17 through this process?
18 A No.
19 Q Okay.
20 A Not to my knowledge. He may have had another
21 control -- another sentence that was going in
22 conjunction with the lifetime parole.
23 Q Oh, I understand. But assuming that this was
24 only one sentence of the lifetime parole, if he went
25 through this process that meant that he would be off

Page 50

1 parole effectively, right?
2 A I can't answer that. I don't know because I
3 didn't review his case for this purpose.
4 Q Oh. In general, would that be correct even if
5 you can't speak directly to Mr. Rodriguez?
6 A Right off the top of my head, I really don't
7 remember.
8 Q Now, if Mr. Rodriguez had been found
9 effectively guilty of the parole violation that he was
10 being held in Rikers Island for, would that remove him
11 from the mandatory termination of sentence review?
12 A I'm not sure.
13 MR. RICKNER: Close this one out. Mark
14 this as Exhibit 9. And this is -- hold on for the
15 record, it is State Defendant's 296 through 297 marked
16 as Exhibit 10.
17 (Exhibit 10 marked for identification.)
18 BY MR. RICKNER:
19 Q So I'd like you to look at the email. I think
20 this is from you on Sunday, March 22, 2020, where you
21 write, "Good afternoon, DOCS lookup often lists the
22 warrants as being active, but they're usually not. DDOI
23 staff will check the status in a more reliable system
24 tomorrow morning. Be well and enjoy the rest of the
25 weekend." Do you see that?

Page 51

1 A Yes, sir.
2 Q Okay. Now when you say DOCS lookup, what do
3 you mean?
4 A The public inmate lookup for New York City
5 DOCS.
6 Q Okay. So that's the -- the database that --
7 that the City of New York maintains with respect to
8 people incarcerated at Rikers Island?
9 A That is correct.
10 MS. DAINOW: Objection.
11 BY MR. RICKNER:
12 Q And that's the same website that's actually
13 accessible to the public, if you put somebody's name in,
14 it'll show information about their incarceration at
15 Rikers Island?
16 A Yes.
17 Q Okay. It says, "DDOI staff will check the
18 status in a more reliable system tomorrow morning." Do
19 you see this?
20 A Yes.
21 Q What is the more reliable system?
22 A They use a system called IIS, I don't know
23 what it stands for. I don't have access to it. But
24 that is the system that they often use in regards to
25 whether or not a warrant is active.

Page 52

1 Q Now -- all right. You know what, we're going
2 to actually close this one out. This isn't for you
3 necessarily.
4 MR. RICKNER: Yeah. Use that one. All
5 right. I'd like to mark this as Exhibit 11.
6 (Exhibit 11 marked for identification.)
7 BY MR. RICKNER:
8 Q Now, I am just going to scroll down to the
9 last page.
10 A Okay.
11 Q It's the page 11. This is the verification.
12 Do you see this?
13 A Yes, sir.
14 Q Did you sign this two days ago?
15 A Yes.
16 Q And without -- I'm not going to go through all
17 10 pages of questions and responses with all the
18 objections, but did you review the document before you
19 signed it under penalty of perjury?
20 A Yes, sir.
21 Q And did you ensure that it was complete and
22 accurate?
23 A Yes, sir.
24 MR. RICKNER: Okay. I don't have any
25 further questions.

Page 53

1          MS. DAINOW:  I just have a few.
2                   EXAMINATION
3  BY MS. DAINOW:
4      Q   Good morning, Ms. Lucas.  My name is
5  Jacqueline Dainow.  I'm at the Office of the Corporation
6  Counsel and I represent the City of New York.  I just
7  have --
8      A   Good morning.
9      Q   Good morning.  I just have a few questions for
10 you.  Did you ever contact the Department of Correction
11 regarding Modesto Rodriguez in March of 2020?
12     A   Not specifically for Modesto Rodriguez.
13     Q   When you say, "not specifically," do you mean
14 that you contacted them for other reasons?
15     A   The contact I had with New York City
16 Department of Corrections was when I sent the production
17 list requesting that the individuals be produced on
18 Wednesday, March 25th, 2020.
19     Q   Did you provide the Department of Correction
20 with a copy of Modesto Rodriguez's warrant lift at any
21 time?
22     A   No, I did not.
23     Q   Since you testified that you did not, do you
24 know who did?
25     A   I know that PO Sheila Bailey was the person

Page 54

1  that was working in DDOI who reviewed the case after we
2  received notification that he was still in custody.
3      Q   And you probably already testified to this,
4  but what date was that, do you recall?
5      A   I want to say that was March 31st, 2020.
6      Q   To your knowledge, would records of that
7  communication be kept within your office?
8      A   Records of what communication, I'm sorry.
9      Q   Any communications between Sheila and the DOC
10 and or you and Sheila, to your knowledge.
11     A   If -- if she did lift the warrant on that
12 date, there should be a form that was sent to DOC
13 requesting that the warrant be lifted.
14     Q   Have you ever seen a form like that with
15 respect to Modesto Rodriguez?
16     A   His specific form, no.
17         MS. DAINOW:  Those are all the questions
18 I have.  Thank you very much.
19         THE WITNESS:  Yeah.
20         MR. RICKNER:  I just have two brief
21 follow-ups because you did get into some interesting
22 stuff.
23             FURTHER EXAMINATION
24 BY MR. RICKNER:
25     Q   This form to DOC, if the warrant lift form

Page 55

1  does not go to DOC, would somebody remain in custody?
2      A   From what the limited information I have about
3  warrant lift forms, they -- they would remain in
4  custody.
5      Q   So we can -- withdrawn.
6          Do you know on March 25th if the people on the
7  list from OBCC were actually produced to the Judicial
8  Center?
9      A   There were some people produced.  I was not
10 stationed there.  So I don't know who was produced and
11 who wasn't produced, but PO Sheila Bailey did do some
12 release interviews on the 25th of March 2020.
13     Q   Okay.  And --
14         MS. DAINOW:  Actually, I -- oh, I'm
15 sorry, Rob, I thought you were done.
16         MR. RICKNER:  No.  Understood.
17 BY MR. RICKNER:
18     Q   To your knowledge, were people produced to the
19 Judicial Center who just didn't get their interviews for
20 one reason or another, lack of time, something else?
21     A   I can't answer that.  I wasn't stationed at
22 the Judicial Center.  There was a supervisor on site, so
23 I really don't know what happened at the Judicial
24 Center.
25     Q   Okay.

Page 56

1          MR. RICKNER:  Now you can go, Ms. Dainow.
2          MS. DAINOW:  Actually, I'm not sure I
3  have anything else.  If you could just give me one
4  minute, please.
5          MS. DAINOW:  Just one last question.  Any
6  communications with the form we were referring to, to
7  your knowledge -- actually withdrawn.
8          I don't have any further questions.
9  Thank you.
10         MR. RICKNER:  All righty then.
11         THE REPORTER:  All right.  I would just
12 like to confirm transcription orders on the record.
13 Mr. Rickner, will you be purchasing the
14 original transcript today?
15         MR. RICKNER:  Me, yes.
16         THE REPORTER:  Yes.  Okay.
17         MR. RICKNER:  And only the original.
18         THE REPORTER:  Okay.  Ms. Cha, will you
19 be purchasing a copy?
20         MS. CHA:  Yes.
21         THE REPORTER:  And Ms. Dainow, will you
22 be purchasing a copy as well?
23         MS. DAINOW:  Yes.
24         THE REPORTER:  All right.  Thank you.
25 With that, we are now off the record at 11:55 a.m.

Page 57

1  Eastern Time.

2      (Proceedings concluded at 11:55 a.m.)

3      (Read and Sign waived.)

4          * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 58

1          CERTIFICATE OF NOTARY PUBLIC

2

3  State of Ohio    )

4  County of Summit )

5

6      I hereby certify that on the 18th day of October

7  2023, before me, a RON notary public for the State of

8  Ohio, LACHONDA LUCAS remotely appeared via

9  videoconference, and prior to testifying, swore an oath,

10 to tell the truth.

11

12     DATED this 18th day of October 2023.

13

14

15          /s/Sarah Schroeter

16          Sarah Schroeter

17          RON Notary Public, State of Ohio

18          Commission No.: 2020-RE-82317

19          Commission Expiration: 11/29/25

20

21

22

23

24

25

Page 59

1          CERTIFICATE OF REPORTER

2

3      I, Olivia Wilson, hereby certify:

4      That the foregoing proceedings were taken

5  before me at the time and place therein set forth;

6      That the proceedings were recorded by me and

7  thereafter formatted into a full, true, and correct

8  transcript of same;

9      I further certify that I am neither counsel

10 for nor related to any parties to said action, nor in

11 any way interested in the outcome thereof.

12

13     DATED, this 2nd day of November 2023.

14

15

16 _____

17     Olivia Wilson, CER-1600

18     Court Reporter

19

20

21

22

23

24

25

**WORD INDEX**

**< 1 >**
**1**   4:5
  22:10, 14
**10**   3:4
  4:14
  17:15
  50:16,
  17   52:17
**10:31**
  1:18
  7:4
**100**   2:10
**10005**
  2:4, 18
**10007**
  2:11
**103**   4:5
  22:2
**104**   4:5
  22:2
**11**   4:15
  52:5, 6,
  11
**11/29/25**
  58:19
**11:26**
  43:6
**11:31**
  43:2
**11:32**
  43:9
**11:34**
  44:1
**11:43**
  48:17
**11:55**
  1:19
  56:25
  57:2

**117**
  4:10
  39:7
**118**
  4:10
  39:7
**126**   4:9
  36:20
**127**   4:9
  36:21
**132**   4:8
  30:21
**134**   4:8
  30:21
**14**   2:3
**142**   4:7
**143**   4:7
**151**   4:6
  24:6
**152**   4:6
  24:6
**1603**   2:3
**18**   1:17
  7:3
**18th**
  58:6, 12
**19**   21:15
**1994**
  14:3
**1998**
  13:22
**19th**
  21:13

**< 2 >**
**2**   4:6
  15:19,
  22   16:4
  24:2, 3,
  24   46:15
**2007**
  14:2, 3,
  7, 22

**2013**
  14:16
**2015**
  14:23, 24
**2018**
  15:14,
  15, 16
**2019**
  17:11, 20
**2020**
  16:3, 8,
  22
  17:11,
  20   21:8,
  13, 15
  32:25
  38:15
  39:12
  50:20
  53:11,
  18   54:5
  55:12
**2020-RE-82317**
  58:18
**2022**
  16:2
**2023**
  1:17
  7:3
  58:7, 12
  59:13
**20394**
  1:22
**21-CV-8565**   1:7
**21-CV-8565CM**
  7:10
**22**   4:5
  50:20
**23rd**
  44:15

**24**   4:6
  11:12
  38:15
**24th**
  24:16,
  18
  28:17
  32:25
  38:20, 23
**25**
  29:14,
  17, 18
**25th**
  33:12
  39:11,
  13
  53:18
  55:6, 12
**26th**
  39:12
**27**   4:7
  29:15, 18
**27th**
  39:12,
  17, 19,
  20   41:10
**28**   2:17
**296**
  4:14
  50:15
**297**
  4:14
  50:15
**2nd**
  59:13

**< 3 >**
**3**   4:7
  27:4, 9,
  13   34:20
**3/19**
  40:24

**3/25**
  33:7
**3:00**
  28:17
**30(b)(4**
  6:6
**31**   4:8
**31st**
  25:13
  42:5
  54:5
**32**   43:2
**35**   4:9
**381**   7:6
**39**   4:10

**< 4 >**
**4**   4:8
  30:20
  31:4, 5
  33:4
**40**   4:11
**43**   4:12
**47**   4:13

**< 5 >**
**5**   4:9
  35:11,
  12, 14
  36:20
**5/1/2020**
  48:22
  49:9
**50**   4:14
**52**   4:15
**53**   3:5
**54**   3:6

**< 6 >**
**6**   4:10
  31:25
  32:1

39:*6, 8*
42:*7*

**< 7 >**
**7** 4:*11*
39:*6*
40:*3, 7, 9*
**79** 43:*13*

**< 8 >**
**8** 4:*12*
43:*14*
44:*4*
**821**
4:*11*
40:*10*
**822**
4:*11*
40:*10*

**< 9 >**
**9** 4:*13*
47:*2, 4*
50:*14*
**94** 13:*15*

**< A >**
**a.m**
1:*18, 19*
7:*4*
43:*6, 9*
44:*1*
48:*17*
56:*25*
57:*2*
**ability**
46:*14*
**able**
49:*3, 16*
**access**
44:*13*

46:*1*
51:*23*

**accessible**
51:*13*
**accurate**
6:*9*
13:*2*
45:*4*
52:*22*
**act** 36:*1*
**action**
6:*5*
59:*10*
**active**
44:*23*
45:*10*
50:*22*
51:*25*

**activities**
23:*13*
**Adam**
36:*25*
**added**
40:*18, 21, 24*
**adding**
40:*15*
**addresses**
40:*5*
**administer ed** 6:*8*
**Administra tive**
23:*20*
**admission**
8:*15*
**affairs**
38:*8*
**affirm**
9:*11*

**afternoon**
30:*25*
31:*9*
33:*6*
50:*21*
**ago**
52:*14*
**agree**
6:*10*
8:*12, 14*
**AGREED**
5:*3, 6, 9, 12*
6:*25*
**agrees**
6:*16*
**Ah** 40:*5*
**Aid**
40:*14*
**al** 7:*10*
**Albany**
16:*10*
**answer**
10:*14*
11:*6*
17:*13*
18:*18*
21:*1*
33:*24*
34:*15, 24*
45:*25*
50:*2*
55:*21*
**Anthony**
37:*7*

**ANTOINETTE**
1:*9*
2:*22*
7:*25*
24:*9*

**anybody**
12:*3*
21:*5*
46:*3*
**apologies**
30:*17*
**appeared**
58:*8*
**Appearing**
2:*7, 14, 21*
**apple**
9:*5, 7, 8*
**appropriat e** 5:*15*
**approved**
20:*18*
**approximat ely** 7:*4*
**April**
16:*2*
**asking**
13:*13, 14*
17:*20*
21:*11*
**assigned**
19:*25*
27:*21*
31:*22*
32:*5, 6*
42:*15, 20* 44:*11*
**Assistant**
7:*23*
36:*24*
**assuming**
49:*23*
**attached**
31:*9*
48:*8*
49:*7*

**ATTORNEY**
2:*16*
6:*13, 16*
7:*15, 23, 24* 8:*2*
**attorneys**
5:*4* 6:*4*
**audio**
6:*15*
8:*14*
43:*17*
47:*20*
**audiovisua l** 8:*14*
**available**
4:*2*
38:*21*
**Avenue**
7:*6*

**< B >**

**bachelor's**
13:*23*
**back**
22:*18*
23:*23*
33:*4*
39:*10*
43:*1, 8, 25* 48:*16*
**Bailey**
38:*2*
42:*3*
53:*25*
55:*11*
**Barnaby**
37:*22*
**basis**
8:*15*
**BASTIAN**
1:*8*

began
   16:19
beginning
   21:17
   27:14
behalf
   8:9
believe
   13:22
   30:20
   38:7, 20
   39:13
   42:6, 8
Bell
   36:21
big   40:4
bigger
   47:3
bit   27:6
Blair
   38:12
Board
   18:25
   19:3, 16
bottom
   45:12
   47:3
bounce
   23:12
   32:22
Brad
   32:14,
   16, 17
break
   11:5, 7
brief
   54:20
bring
   24:7
brings
   15:13
broken
   31:8

brought
   23:9
   38:25
building
   27:22
   35:19, 22
Bureau
   32:2
button
   22:5, 19

< C >
call
   38:14
   42:4, 8,
   12   46:8
called
   9:19
   51:22
canceled
   44:25
   45:18
captain
   33:15,
   17, 20
   34:2, 5,
   9, 16, 21
   35:1, 4
captains
   33:16
capture
   6:14
captured
   8:17
capturing
   8:13
Carole
   37:9, 10
Case
   1:6
   19:19
   41:18
   42:1

44:10
   46:7, 20
   50:3
   54:1
cases
   15:23
   20:16
   21:19
   23:18,
   20, 22
   30:13
   41:3
cat   9:8
CC'ed
   24:10, 25
cell
   25:19
Center
   27:18,
   23   28:4
   29:6
   33:16,
   20
   34:10
   35:5, 15
   38:23,
   25
   39:11
   55:8, 19,
   22, 24
CER-1600
   1:21
   59:17
certain
   20:16
certainly
   8:19
CERTIFICAT
E   58:1
   59:1
certify
   58:6
   59:3, 9

CHA
   2:19
   7:22, 23
   8:21
   43:4
   56:18, 20
chain
   23:10
   24:9
   27:14
   40:19
change
   15:21
   44:23
   45:5
charge
   24:23
Charlie
   9:5
chat
   6:18
check
   46:11
   50:23
   51:17
chief
   23:6
   24:25
   28:20,
   24   40:21
chief's
   40:20
Church
   2:10
circumstan
ce   26:23
circumstan
ces
   26:13, 25
CITY
   1:7
   2:9
   7:9, 21

33:18
   35:17,
   22   36:6,
   9, 10, 14
   37:1, 8,
   11   38:7
   51:4, 7
   53:6, 15
Civil
   5:11, 14,
   15   6:7

classified
   20:15
clear
   10:14
   13:2
   31:13
   34:20
   41:7
clearing
   35:9
close
   23:24
   27:1
   30:16
   35:8
   39:4, 22
   42:21
   47:1
   50:13
   52:2
closed
   29:6, 20
   38:23
   39:1
   45:10, 13
closure
   44:24
   45:13
CM   1:7
CMS
   46:7, 8

college
  13:*16*, *22*
column
  45:*12*
come
  20:7
  43:*1*
comes
  36:*12*
coming
  48:*6*

Commission
  58:*18*, *19*
communicat
ion
  6:*17*
  40:*19*,
*21*  54:*7*,
*8*
communicat
ions
  54:*9*
  56:*6*
Community
  13:*25*
  21:*9*

comparison
  12:*5*
compile
  23:*21*
  42:*16*
complete
  11:*16*
  48:*7*, *21*
  49:*1*, *7*
  52:*21*

completely
  32:*12*, *13*

computer
  45:*24*
  46:*1*
concern
  29:*5*, *10*
concluded
  57:*2*

conditions
  15:*9*
conducted
  6:*7*
  8:*10*
  21:*23*
confirm
  56:*12*
conjunctio
n  49:*22*
Consolidat
e  28:*20*
consolidat
ed  29:*4*
contact
  53:*10*, *15*
contacted
  53:*14*
continue
  41:*4*
control
  49:*8*, *21*

controlled
  35:*21*
controllin
g  5:*16*

coordinate
  23:*13*
copy
  53:*20*
  56:*19*, *22*

Corporatio
n  7:*20*
  53:*5*
corpus
  17:*4*, *6*,
*12*
  18:*11*,
*15*, *21*,
*24*
  19:*14*,
*15*
  20:*22*
  21:*5*
  26:*19*
  44:*17*
correct
  18:*1*, *7*,
*10*
  32:*24*
  33:*9*, *13*
  45:*1*
  50:*4*
  51:*9*
  59:*7*

Correction
  13:*25*
  14:*9*, *14*
  21:*9*
  35:*17*
  36:*10*,
*15*
  53:*10*, *19*
Correction
s  53:*16*
correctly
  21:*16*
counsel
  6:*25*
  7:*13*, *20*
  9:*22*
  10:*8*

53:*6*
  59:*9*
County
  58:*4*
course
  11:*20*, *22*
COURT
  1:*1*
  6:*9*
  7:*11*
  10:*19*,
*24*  12:*9*,
*23*  13:*3*
  22:*4*
  36:*4*
  59:*18*
cover
  40:*5*
Covid
  20:*16*
  21:*17*
  26:*4*, *8*
  28:*10*,
*13*  29:*7*
created
  30:*8*
creating
  6:*9*
criminal
  11:*23*, *25*
Cruz
  38:*4*
current
  21:*19*
custody
  17:*9*, *24*
  21:*23*
  37:*1*, *3*
  41:*1*, *17*
  54:*2*
  55:*1*, *4*
cut

47:*20*

< D >
DAINOW
  2:*12*
  3:*5*
  7:*19*, *20*
  8:*20*
  33:*23*
  34:*13*,
*22*
  35:*18*
  36:*5*, *16*
  43:*3*
  51:*10*
  53:*1*, *3*,
*5*  54:*17*
  55:*14*
  56:*1*, *2*,
*5*, *21*, *23*
dangerous
  36:*2*
Darwin
  37:*12*
database
  44:*13*
  46:*6*
  51:*6*
databases
  46:*11*
DATE
  1:*17*
  41:*11*
  44:*9*
  45:*12*
  48:*6*
  49:*9*, *13*
  54:*4*, *12*
DATED
  58:*12*
  59:*13*
David
  9:*6*

**day** 7:*3*
16:7, *23*
29:17
32:7, *8*
33:*12*
42:16
58:6, *12*
59:*13*
**days**
29:3, *12*
30:5, *7*
49:*8*
52:14
**DC** 23:*13*
**DCJC**
22:*23*
**DDOI**
19:*16*,
*17*
21:*22*
23:7, *22*
24:*24*
25:7, *9*,
*23*
27:*17*,
*22* 30:*3*,
*12*
31:*15*
34:*4*
36:*24*
41:17,
*19* 42:*8*
50:*22*
51:*17*
54:*1*
**deal**
18:*4*
**dealing**
21:*7*
**decide**
25:*5*
**decides**
30:*10*

**decision**
21:*21*
23:*21*
**declared**
19:*18*
**deemed**
5:*14*
15:*8*
**Defendant**
2:*14*
43:*13*

**Defendants**
1:*11*
2:*21*
7:*24*
**Defendant'**
**s** 4:*5*,
*6*, *7*, *8*,
*9*, *10*, *11*,
*14* 22:*2*
24:*5*
30:*21*
36:*20*
39:*7*
40:*10*
50:*15*
**Defense**
40:*14*
**degree**
13:*21*
**deleting**
39:*23*

**delinquent**
19:*18*
**Delrio**
23:*2*
24:*23*
27:*14*
**demonstrat**
**e** 10:*25*

**dep**
40:*15*

**DEPARTMENT**
2:*9*
13:*24*
14:8, *13*
15:*7*
21:*9*
35:*17*
36:*10*,
*15* 37:*5*
53:*10*,
*16*, *19*
**depending**
30:*13*
46:*4*

**DEPOSITION**
1:*13*
5:*10*
6:7, *15*,
*19*, *21*,
*25* 7:*8*
8:*8*
10:3, *5*
**Deputy**
24:*25*
40:16, *21*
**described**
23:*17*

**describing**
20:*23*
**DESCRIPTIO**
**N** 4:*4*

**designated**
7:*6*
**determine**
48:8, *22*
49:*2*

**determined**
25:*14*
**determinin**
**g** 25:*2*
**device**
6:*22*
**different**
17:*23*
18:*23*
19:*5*
25:*11*
32:*12*,
*13*
47:*15*
49:*6*
**differentl**
**y** 20:*22*
21:*5*
**difficult**
10:*11*
**directive**
41:*2*
**directly**
50:*5*
**Director**
40:*13*
**discharge**
28:*4*

**discharges**
22:*24*
42:18, *20*
**discussed**
33:*11*
38:*16*

**disruption**
43:*17*
47:*21*
**DISTRICT**
1:1, *2*
7:*11*

**Division**
14:*10*,
*11*, *18*
19:*13*
**DOC**
14:*1*
36:*3*
37:8, *11*,
*15* 38:*7*
54:9, *12*,
*25* 55:*1*
**D-O-C-C**
36:*3*
**DOCCS**
2:*14*
18:*22*
22:*24*
25:*18*
31:*14*
35:*22*
36:3, *6*,
*9* 37:*1*
45:*23*
46:2, *10*
**DOCS**
50:*21*
51:2, *5*
**document**
17:*8*
22:*1*
52:*18*
**doing**
21:*10*
32:*10*
**Donique**
37:*16*
**door**
25:*20*
**doors**
36:*13*
**DOUGLAS**
1:*9*
2:*22*

7:*25*
24:*9*
download
  4:*2*
drive
  20:*18*
drugs
  11:*10*
due
  20:*22*
  28:*9, 11*
  29:*6*
duly
  9:*19*
duty
  31:*22,*
*25*  32:*4,*
*6*

< E >
earlier
  12:*4*
  23:*17*
  42:*13*
early
  16:*17*
  48:*9*
Eastern
  7:*4*
  43:*6, 9*
  44:*1*
  48:*17*
  57:*1*
easy
  27:*7*
Edward
  23:*2*
  27:*14*
effectivel
y  50:*1,*
*9*
either
  11:*24*

14:*1*
37:*19*

electronic
  6:*22*
eligible
  48:*9*
Elliot
  19:*6*
email
  6:*19*
  23:*9, 10*
  24:*9, 22*
  25:*13*
  27:*14*
  30:*24*
  31:*7*
  33:*5*
  34:*25*
  39:*16*
  40:*5, 12,*
*24*  41:*2,*
*8*  42:*6*
  50:*19*
emails
  24:*25*
  27:*2*
employees
  36:*14*
enforcemen
t  14:*4*
enjoy
  50:*24*
ensure
  52:*21*
enters
  45:*6*
entitled
  6:*5*
escort
  20:*9, 13*
  25:*3, 5,*
*15, 18, 20*

escorted
  39:*17*
ESQUIRE
  2:*5, 12,*
*19*
ET   1:*18,*
*19*   7:*10*

eventually
  23:*9*
  41:*12*
everybody
  27:*3*
  42:*25*
exact
  39:*25*
exactly
  10:*12*
EXAMINATIO
N   3:*3*
  9:*25*
  53:*2*
  54:*23*
example
  11:*21*
  12:*4*
Excellent
  27:*12*
exception
  32:*7*
excuse
  14:*11*
  38:*10*
EXHIBIT
  4:*4*
  22:*10,*
*14*
  23:*24*
  24:*2, 3*
  25:*11*
  27:*2, 4,*
*9, 13*
  30:*17,*

*20*   31:*4,*
*5*   32:*22*
  33:*4*
  35:*9, 11,*
*12, 14*
  36:*19*
  38:*16*
  39:*5, 8,*
*22*   40:*3,*
*7, 9*
  42:*21*
  43:*10,*
*14*   44:*4*
  47:*2, 4*
  50:*14,*
*16, 17*
  52:*5, 6*
exhibits
  39:*23*
existed
  30:*3*

experience
  12:*25*

Expiration
  58:*19*

< F >
facility
  20:*17*
  35:*16*
factors
  20:*6*
fair
  12:*20,*
*25*   28:*9*
  34:*8*
  44:*12*
fairly
  18:*17*
false
  13:*12*

faster
  39:*24*
February
  16:*8, 13,*
*16, 17*
FEDERAL
  5:*1, 11,*
*13, 15*
  6:*1, 6*
field
  48:*7, 20*
Figueroa
  36:*25*
figure
  21:*25*
filed
  7:*10*
final
  44:*10*
find
  38:*25*
  41:*18*
fine
  11:*5*
finish
  18:*2*
  45:*16*
finished
  10:*13*
  11:*6*
finishing
  20:*24*
first
  10:*10*
  23:*10,*
*11*   24:*8*
  27:*17*
five
  42:*25*
  49:*8*
fix
  43:*20*

flow-out
  28:13
follow
  41:25
following
  33:6
  41:8
follows
  9:20
follow-
ups
  54:21
foregoing
  59:4
forget
  22:5
forgot
  31:2
form
  5:7
  49:1, 6,
7   54:12,
14, 16,
25   56:6
formatted
  59:7
forms
  55:3
formulate
  34:5
forth
  59:5
found
  50:8
Friday
  39:17
full
  11:15
  59:7
fully
  33:25

function
  30:12
  36:13
functions
  35:20
FURTHER
  5:6, 9,
12
  52:25
  54:23
  56:8
  59:9

< G >
Gaynor
  38:6
Gee
  7:22, 23
GEEWON
  2:19
geewon.cha
@ag.ny.gov
  2:20
GENERAL
  2:16
  7:23
  8:2
  17:19
  50:4
generally
  26:1, 2,
6
General's
  7:24
gestures
  10:25
getting
  26:18
  48:11
give
  9:12
  11:15

13:1, 8,
12
  19:23
  27:8
  30:18
  56:3
go
  13:16
  23:18
  30:23
  31:3
  34:2
  43:19
  47:13
  49:16
  52:16
  55:1
  56:1
goes
  18:22
  30:11
  34:9
going
  10:9, 12
  13:5, 9
  16:23,
25
  19:25
  22:1, 16,
18, 19
  23:24
  24:6
  25:10,
12   27:1,
3, 6
  29:25
  30:23
  31:7, 24
  32:5
  33:4
  35:8, 10
  39:4, 10,
24

41:18,
19, 21
  42:21,
23   43:5
  48:11
  49:21
  52:1, 8,
16
GONZALEZ
  1:8
  2:22
  7:25
Good
  7:2, 17,
19, 22
  8:5, 24
  9:1
  10:2, 4
  30:24
  31:8
  33:6
  39:16
  48:1
  50:21
  53:4, 8,
9
govern
  8:11
graduate
  13:7, 18,
20
graduated
  13:22
granted
  44:18
  48:23
great
  22:7
  24:8
Grima
  37:20
ground
  10:9

group
  6:18
  19:13
guards
  35:25
guess
  19:12
  30:23
  40:13, 15
guilty
  50:9

< H >
habeas
  17:4, 6,
12
  18:11,
15, 20,
24
  19:13,
15
  20:22
  21:4
  26:18
  44:17
half
  15:12
  16:2
hand
  9:10
hands
  11:1
happened
  55:23
happens
  26:1, 2,
3, 6
  32:5
Harry
  9:5
head
  10:25
  50:6

health
  38:7
hearing
  44:10
hearings
  15:7
  42:16
held
  50:10
high
  13:7
history
  13:6
hit
  22:18
Hold
  13:11
  15:24,
  25
  23:11,
  20   24:6
  42:16
  48:25
  50:14
hopefully
  25:12
  27:11
hospital
  20:11
hour
  42:23
hours
  11:12
human
  13:23
hundreds
  12:20

< I >
idea
  12:16,
  18

37:21
39:21
identifica
tion
  6:12
  22:14
  24:3
  27:9
  31:5
  35:12
  39:8
  40:7
  43:14
  47:4
  50:17
  52:6

identified
  6:11, 18,
  23
identify
  7:13
  8:4
IIS
  51:22
immediate
  20:6
impair
  11:11
impeached
  12:1
important
  13:1
  22:25
incarcerat
ed
  28:10
  36:1
  38:24
  40:23
  42:9
  51:8

incarcerat
ion
  51:14
include
  8:13
included
  24:21
Index
  7:10
Indiscerni
ble
  43:17
  47:20
individual
s   23:23
  28:25
  53:17
informatio
n   41:24
  44:9
  45:5, 22
  51:14
  55:2
informing
  42:9
initially
  24:16
inmate
  51:4
inmates
  28:6
  33:7
institutio
n   19:18
instruct
  6:16
instructin
g   48:20
instructio
ns
  19:24
  47:8

interested
  59:11
interestin
g   54:21
Intern
  2:25
  8:2
interview
  19:20,
  21
  24:15,
  18
  25:22,
  25   26:5,
  9, 14, 22,
  23   32:11
interviewe
d   42:17
interviews
  21:22
  30:14
  33:7, 11
  38:22
  41:5
  55:12, 19
involved
  25:8
involves
  24:10
involving
  14:4
Island
  16:11,
  18, 25
  19:17
  27:22,
  24, 25
  33:15,
  16
  34:21
  35:15,

20   41:6
42:20
50:10
51:8, 15
issued
  44:8, 16
it'll
  51:14
its
  13:25

< J >

Jacqueline
  42:6
  53:5
JACQUELYN
  2:12
  7:19
jadainow@l
aw.nyc.gov
  2:13
jail
  25:19
  35:20
James
  37:10
January
  14:22
  44:15
Jason
  37:18
Jenkins
  35:3
JOB
  1:22
  14:4, 18
  15:20
  33:21, 25
Joseph
  37:20

judge
 18:21
 23:20
judges
 21:20
Judicial
 27:18,
23  28:3
 29:5
 33:16,
20
 34:10
 35:5, 15
 38:23,
25
 39:11
 55:7, 19,
22, 23
July
 14:2, 3,
7
jump
 10:13
June
 15:15, 16

< K >
Kennedy
 42:7
kept
 54:7
Kim
 2:25
 8:1
knew
 41:23
know
 10:12,
23  13:9,
11
 14:15
 17:10,
14, 16,

21
 18:18
 19:12
 24:14,
17, 20,
21  25:9
 27:13
 28:9
 29:19
 31:20
 32:17
 33:1, 10,
25  34:1,
18
 35:20
 37:5, 17,
19, 23
 38:1, 2,
13  39:2,
10, 19
 40:18,
22  42:4,
22, 24
 46:13
 50:2
 51:22
 52:1
 53:24,
25  55:6,
10, 23
knowledge
 49:20
 54:6, 10
 55:18
 56:7

< L >
LACHONDA
 1:9, 16
 2:21
 3:3
 7:8, 25
 9:4

46:16
 58:8
lack
 55:20
Larry
 9:5, 7
late
 15:14
LAW  2:9
 14:4
 23:20
laws
 8:10
left
 42:24
Legal
 1:20
 2:25
 7:6
 8:1, 7
 40:14
letting
 25:19
 36:13
 49:2
Liberty
 2:17
lifetime
 49:14,
16, 22, 24
lift
 46:13
 53:20
 54:11,
25  55:3
lifted
 25:22,
25
 26:10,
11, 14
 32:18,
25  33:3
 41:25

44:21,
22  45:2,
3, 7, 8,
23  46:9,
12  54:13
limited
 28:7
 55:2
line
 27:17
 45:11
Lisa
 37:22
list
 23:9, 21
 25:9
 28:1, 18
 29:4, 9,
14, 22,
24  30:1,
2, 7, 11
 31:9, 13
 34:4, 9,
16, 20
 38:14,
15, 17,
19
 53:17
 55:7
listed
 46:18
lists
 28:21
 34:2
 38:17
 42:16
 50:21
little
 27:6
 47:3
live
 19:25

located
 27:25
 42:18
LOCATION
 1:20
log
 48:11, 12
logged
 43:22
long
 10:11,
25
 14:21
 15:10, 24
longer
 26:21
look
 22:18
 27:12
 41:18,
22  50:19
looking
 32:20
 39:15
 40:9
looks
 24:16
 28:16
 34:9
lookup
 50:21
 51:2, 4
Lorraine
 40:11, 13
LUCAS
 1:10, 16
 2:21
 3:3
 7:8, 25
 8:25
 9:1, 4,
7, 10, 14,
16  10:2

23:13
40:16
43:16,
21    44:3
46:15
53:4
58:8

< M >
maintains
51:7
making
36:1

management
37:2, 4
46:7
mandatory
47:9, 18
48:2, 21
50:11
Manhattan
16:11,
18, 24
21:16,
18
31:25
32:1
41:3
42:7, 18,
19

manipulate
22:17
March
16:3, 8,
14, 17
17:10,
11   21:8,
13, 15
24:16,
18
25:13

28:17
32:25
38:15,
20, 23
39:12,
17, 19,
20
50:20
53:11,
18    54:5
55:6, 12
mark
21:25
22:5, 6,
8    24:1,
7    27:4
30:19
31:3
35:10
37:24
39:5
40:2
43:11
47:2
50:13
52:5
marked
22:12,
14    24:3
27:9, 12
31:5
35:12
39:8
40:7
43:14
47:4
50:15,
17    52:6
Marquis
46:24
matter
7:9
8:1, 11

Mayor's
38:11
McEvilley
40:11, 13
McIntosh
19:6
mean
17:18
19:22
20:5, 11,
19
23:16
26:20
27:20
29:2, 17
31:23
33:17
35:21
37:4
48:5
49:10,
15    51:3
53:13
meaning
10:19
16:6
36:9
40:16
means
6:19
8:12, 14
20:24
27:21
31:24
32:4
48:6
meant
23:17
49:25
medical
11:14
medically
20:10

medication
11:10
meet
19:23
meeting
20:4
Melissa
38:2

Memorandum
4:13
47:6
48:20
memory
11:11
merge
14:13
merit
48:23, 24
method
8:16
MICHELLE
1:8
2:22
7:25
Mid-2018
15:16
middle
39:16
mid-March
16:22
mind
43:12
minute
56:4
MODESTO
1:4
7:17
24:10,
14
31:16
38:17

53:11,
12, 20
54:15
moment
39:15
Monastero
37:7
Monday
29:6
month
21:14, 15
morning
7:2, 18,
19, 22
8:5, 24
9:1
10:2, 4
39:16
50:24
51:18
53:4, 8,
9
move
22:19
40:3
41:3
49:3
moved
39:19, 20
moving
36:19
MTS    49:9
multiple
17:23

< N >
name
7:5
8:6
9:3, 7
46:5, 15
51:13
53:4

names
 21:*21*
Nancy
 9:*6*
necessaril
y  19:*10*
 52:*3*
necessary
 6:*10*
need
 28:*1*
needed
 25:*3, 5*
 29:*11*
 41:*24,*
*25*  42:*17*
neither
 59:*9*
NEW  1:*2,*
*7*  2:*4,*
*9, 11, 16,*
*18*  7:*6,*
*7, 9, 11,*
*21, 23*
 14:*25*
 33:*18*
 35:*16,*
*21*  36:*9,*
*14*  37:*1,*
*8, 11*
 38:*7*
 51:*4, 7*
 53:*6, 15*
Newlin
 33:*14*
nice
 10:*14*
nods
 10:*24*
normal
 26:*13,*
*25*  41:*23*

Notary
 2:*24*
 8:*3, 5,*
*6, 22, 24*
 9:*2, 9,*
*15, 20,*
*21*  58:*1,*
*7, 17*
Note
 34:*13*
 36:*5, 16*
noticing
 7:*14*
notificati
on
 18:*25*
 19:*7, 8,*
*16*
 41:*16*
 54:*2*
notified
 41:*13*
notify
 19:*3*
November
 59:*13*
Number
 7:*10*
 19:*5*
 28:*6*
numbers
 22:*8*
NYC
 23:*14*
 37:*15*

< O >
oath
 6:*8*
 11:*18*
 58:*9*
OBCC
 55:*7*

Objection
 33:*23*
 34:*14,*
*22*
 35:*18*
 36:*5, 16*
 51:*10*

objections
 5:*7*
 52:*18*
October
 1:*17*
 7:*3*
 58:*6, 12*
offender
 20:*15*
Office
 7:*20, 24*
 8:*2*
 10:*17*
 16:*11,*
*18, 24*
 20:*1*
 21:*16,*
*18*
 23:*14*
 29:*9*
 32:*7, 9*
 36:*24*
 38:*11*
 41:*3*
 42:*18,*
*19*  53:*5*
 54:*7*
OFFICER
 1:*8*
 7:*5*
 14:*20,*
*21, 22*
 19:*25*
 20:*1, 17*
 29:*10,*

*13*
 31:*22,*
*25*  32:*4,*
*6*  42:*6*
officers
 27:*21*
official
 8:*13*
Oh  13:*8*
 20:*19*
 22:*6*
 27:*23*
 31:*2*
 40:*3*
 45:*6*
 47:*24*
 49:*5, 23*
 50:*4*
 55:*14*
Ohio
 58:*3, 8,*
*17*
Okay
 7:*2*
 10:*8*
 11:*18,*
*20, 24*
 12:*3, 11,*
*22, 25*
 14:*3, 7,*
*17, 21,*
*24*  15:*2,*
*10, 16,*
*20, 24*
 16:*3, 22,*
*25*  17:*2,*
*10*
 18:*11*
 19:*8, 21*
 20:*3, 13,*
*21*  21:*3,*
*8*  22:*3,*
*20, 23*

 23:*5, 8,*
*24*
 24:*21*
 25:*1, 17*
 26:*7, 11,*
*17, 24*
 28:*1, 16,*
*20*  29:*2,*
*17, 24*
 30:*4, 7,*
*10, 19*
 31:*16,*
*19*
 32:*14,*
*18*  33:*2,*
*9, 17, 20*
 34:*3, 8,*
*17*  35:*3,*
*5, 7, 10,*
*24*  36:*9,*
*12, 25*
 37:*7, 9,*
*12, 18*
 38:*14,*
*24*  39:*3,*
*5, 6, 15,*
*22*
 40:*15,*
*22*  41:*7,*
*19*
 42:*12,*
*25*
 43:*10,*
*18, 20,*
*25*  44:*6,*
*12*  45:*1,*
*6, 14, 19,*
*22*  46:*1,*
*15, 25*
 47:*17*
 48:*1, 14,*
*19*
 49:*19*

51:*2*, *6*, *17*
52:*10*, *24*
55:*13*, *25*
56:*16*, *18*
old
13:*13*, *14*
Olivia
1:*21*
7:5
59:*3*, *17*
OMH-level
20:*16*
Once
12:*10*, *12*
17:*17*
19:*8*, *12*, *15*
29:*18*
44:*20*
45:*1*, *6*, *22*
open
21:*19*
29:*7*
39:*11*
oppose
8:*15*
opposite
39:*25*
orchestrat ing   41:*5*
ordered
40:*23*
orders
17:*9*
56:*12*
ordinary
11:*15*

original
56:*14*, *17*
Oscar
9:*6*
outcome
59:*11*
outside
6:*17*
12:*12*
26:*8*

< P >
p.m
28:*17*
Padilla
37:*12*
PAGE
3:*3*
4:*4*
22:*19*, *21*
23:*10*, *11*   24:*7*
27:*13*
31:*17*
32:*20*, *21*
34:*20*
52:*9*, *11*
pages
31:*8*
52:*17*
paragraph
24:*11*

paragraphs
47:*19*
48:*2*
paramount
22:*24*
Park   7:6
parole
11:*20*,

*22*, *24*
12:*12*, *15*, *17*
14:*1*, *4*, *8*, *10*, *11*, *18*, *20*, *21*, *22*
15:*3*, *4*, *6*, *7*, *19*
16:*3*
17:*24*
18:*8*, *25*
19:*3*, *25*
20:*1*, *17*
21:*6*
23:*7*
27:*21*
29:*10*, *12*
40:*14*
42:*6*
44:*8*
46:*19*, *22*
48:*24*
49:*11*, *14*, *16*, *22*, *24*
50:*1*, *9*
part
6:*15*
17:*24*
19:*11*
21:*2*, *3*
25:*6*
27:*23*
34:*11*
40:*19*
41:*4*
43:*12*
44:*12*
47:*16*

participat ing   6:*18*
parties
5:*4*, *13*
6:*4*, *10*
8:*12*, *17*
59:*10*
party
6:*13*
passage
11:*15*
pause
39:*23*
penalty
52:*19*
pending
23:*18*
people
17:*23*
18:*2*, *4*, *8*, *12*, *16*
19:*5*
20:*21*
21:*4*
25:*9*
28:*10*
29:*3*, *11*, *20*, *25*
33:*10*
34:*10*
36:*1*, *3*
38:*24*
41:*4*
42:*16*
51:*8*
55:*6*, *9*, *18*
perfect
40:*5*
perform
42:*15*

performed
25:*7*
36:*14*
period
16:*19*
perjury
52:*19*
person
6:*20*
17:*9*
19:*1*
32:*10*
40:*12*
53:*25*
personnel
8:*16*
36:*7*
46:*2*
person's
26:*18*, *20*
phone
6:*22*
42:*4*, *8*, *12*
photograph s   6:*14*

physically
16:*7*
Piadosa
38:*4*
pick
20:*17*
picture
6:*11*
place
46:*10*
59:*5*
plainly
35:*24*
Plaintiff
1:*5*
2:*7*

7:17
8:9, *19*
platform
1:20
plea
18:4
please
7:13
8:3, *22*
9:2, *10*
10:13
22:11
27:4
31:9
33:6
40:3
45:16
56:4
PLLC
2:2
7:17
PO
12:18
28:25
31:22
42:3
53:25
55:11
point
25:2
portion
49:12
POs    32:6
posed
11:7
position
15:11,
*18, 24,
25*    16:1
positions
12:16
positive
29:7

predecesso
r    14:1
preliminar
y    44:9
prep
19:19
30:12
presence
5:5
PRESENT
2:23
8:1
9:20

presenting
15:23
presiding
46:20, 23
prior
12:1
20:16
38:16
46:21
48:22
58:9
Probably
24:8
29:22
45:17
47:3
54:3
problem
40:1

procedural
8:10
Procedure
5:11, *14,
16*    6:7
17:3
18:21
20:23

proceeding
7:7
8:15, *17*
proceeding
s    6:15
11:*21,
22, 25*
12:*13,
19, 22*
57:2
59:4, *6*
process
15:23
21:10
23:23
33:22
44:7, *25*
45:18
49:*17, 25*
produce
33:6
produced
28:*3, 7,
21*
30:15
33:10
34:6
53:17
55:*7, 9,
10, 11, 18*

production
28:18
29:8
34:1
38:14
53:16
promotion
14:24
provide
53:19

provided
5:10, *13*
12:4, *5*
35:16
46:23
47:8
providing
25:9
PRS
15:22
24:24
46:15

psychology
13:23
Public
2:24
8:5, *6,
24*    9:*2,
9, 15, 20,
21*    51:*4,
13*    58:*1,
7, 17*
Pull
23:25

purchasing
56:*13,
19, 22*
purpose
50:3
purposes
5:10
Pursuant
6:6
8:10
put
40:4
43:11
45:4
47:2
51:13

putting
29:21
PVU
24:24

< Q >
quality
49:7
question
10:13,
*14*    11:6
12:3
13:10
16:9
17:19
25:10
34:24
56:5
questions
10:12
52:17,
*25*    53:9
54:17
56:8
quick
43:20
quickly
13:6
quite
27:2
30:17

< R >
Rabiah
38:6
R-A-B-I-A-
H    38:6
Rachael
36:21
raise
9:10
rambling
10:11

**rare**
18:17
**reach**
18:4
**reached**
41:17
**read**
6:23
27:5
57:3
**real**
43:20
**really**
17:13,
16, 19,
21
18:18
20:5
21:1
29:19
30:23
32:17
45:25
47:12
50:6
55:23
**reason**
11:14
26:21
44:24
45:13
55:20
**reasons**
53:14
**REC** 45:9
**recall**
41:21
54:4
**receive**
14:24
19:8
**received**
18:24

19:1, 15,
16 21:4
41:16,
23 42:5
45:17
54:2
**receives**
19:13
**receiving**
19:11
41:8
**record**
6:4, 10,
14, 25
7:3, 7,
14 8:4,
13 9:3
10:10,
14 13:2
30:20
36:20
39:6
40:10
43:5, 7,
9, 19, 24
44:1
45:10
48:15,
16, 19
50:15
56:12, 25
**recorded**
10:24
59:6
**recording**
8:14
**records**
54:6, 8
**Referee**
5:5
**referred**
6:24

**referring**
56:6
**regarding**
44:9
47:9
53:11
**regardless**
26:17
**regards**
51:24
**related**
59:10
**relations**
13:23
**release**
15:8
19:20,
21
21:22
23:23
24:15,
18
25:22,
25 26:8,
14, 22,
23
28:10
30:14
32:11
33:7, 11
41:5
42:10
48:9, 23,
24 55:12
**released**
17:9, 24
18:5, 12,
16, 22
19:2
20:21,
24 21:6,
23 26:5,

18, 20
28:2, 11
29:3
38:17
40:24,
25 41:4,
9, 11
42:17
**releasee**
15:8
19:20,
22, 23
44:7
48:8, 23
**releasees**
21:21
30:15
34:5
**releases**
21:7
**reliable**
50:23
51:18, 21
**remain**
25:21
55:1, 3
**Rembert**
38:9, 11
**remember**
13:11
14:15
21:16
29:19
39:11
50:7
**REMOTE**
1:20
6:1, 8
7:6 8:6
**remotely**
6:9
8:9

16:20
58:8
**remove**
50:10
**render**
21:20
23:21
**reopened**
39:14
**Repeat**
30:18
**report**
27:18
32:8, 9
48:7
**REPORTER**
1:21
6:9
7:2
8:3, 8,
22 9:22
10:24
12:23
13:3
22:4, 6,
9, 12
36:4
43:5, 8,
19, 25
48:14,
16
56:11,
16, 18,
21, 24
59:1, 18
**reporting**
19:24
20:2
**reports**
31:24
**represent**
7:15, 21

49:*15*
53:*6*
**representi**
**ng** 7:*24*

**represents**
15:*6*
**requested**
34:*2*

**requesting**
53:*17*
54:*13*
**require**
20:*16*
25:*14,*
*17, 20*
**requiremen**
**t** 26:*15*
**requires**
20:*9*
**resent**
30:*8*
**reserved**
5:*7*
**residence**
20:*18*
**resolved**
21:*20*
23:*19*
**respect**
5:*16*
33:*21*
35:*14*
49:*10*
51:*7*
54:*15*

**respective**
5:*4*
**respects**
46:*9*

**responded**
28:*16*
**response**
28:*24*
**Responses**
4:*15*
13:*2*
52:*17*
**responsibi**
**lities**
15:*20*
**responsibl**
**e** 25:*1*
35:*25*
45:*23*
**rest**
50:*24*
**resulted**
42:*10*
**return**
27:*22*
**review**
19:*19,*
*24, 25*
21:*18*
23:*22*
25:*6*
50:*3, 11*
52:*18*
**reviewed**
54:*1*
**revised**
31:*9*

**revocation**
12:*17*
15:*3, 4,*
*6, 7, 19,*
*23* 16:*4*
21:*19*
23:*18*
40:*14*

44:*7*
46:*20, 22*
**RICKNER**
2:*2, 5*
3:*4, 6*
7:*16, 17*
8:*19*
9:*24*
10:*1*
22:*4, 7,*
*10, 13,*
*15* 24:*1,*
*4* 27:*10*
30:*19,*
*22* 31:*2,*
*6, 12*
33:*24*
34:*3, 7,*
*17, 19,*
*23* 35:*2,*
*8, 13, 23*
36:*8, 18*
39:*4, 9*
40:*2, 8*
42:*22*
43:*10,*
*15, 18,*
*21* 44:*2*
47:*1, 5*
48:*10,*
*18*
50:*13,*
*18*
51:*11*
52:*4, 7,*
*24*
54:*20,*
*24*
55:*16,*
*17* 56:*1,*
*10, 13,*
*15, 17*

**right**
9:*10*
13:*16*
14:*17*
17:*25*
18:*2, 6,*
*9, 12*
20:*12*
21:*24*
22:*1*
23:*3, 12*
24:*1, 12,*
*14*
25:*12*
27:*3*
28:*7, 14*
29:*14*
30:*16*
32:*24*
33:*4, 14*
38:*16,*
*22* 40:*2,*
*9, 11, 18*
43:*1, 8*
45:*6*
47:*1, 6*
48:*1, 10*
50:*1, 6*
52:*1, 5*
56:*11, 24*
**right-**
**hand**
45:*11*
**rights**
5:*13*
**righty**
56:*10*
**Rikers**
16:*11,*
*18, 25*
19:*17*
27:*22,*
*23, 25*

33:*15,*
*16*
34:*21*
35:*15,*
*19* 41:*6*
42:*20*
50:*10*
51:*8, 15*
**Rob**
7:*16*
55:*15*
**rob@rickne**
**rpllc.com**
2:*6*
**ROBERT**
2:*5*
**robot**
47:*24*
48:*13*
**RODRIGUEZ**
1:*4*
7:*9, 17*
24:*11,*
*15*
25:*14*
31:*16*
38:*17*
40:*23,*
*25* 41:*9,*
*13* 42:*9*
47:*10*
50:*5, 8*
53:*11,*
*12* 54:*15*
**Rodriguez'**
**s** 42:*10*
49:*11*
53:*20*
**role**
21:*8*
**RON**
58:*7, 17*

**room**
6:*20*, *22*
**Rose**
27:*15*
**roughly**
29:*18*
**Rule**
6:*6*
11:*5*
40:*20*
**Rules**
5:*11*, *13*,
*15*   6:*6*
8:*10*
10:*9*, *18*
**Russell**
46:*24*

**< S >**
**s/Sarah**
58:*15*
**Sam**
2:*25*
8:*1*   9:*8*
**Sarah**
2:*24*
8:*6*
58:*16*
**saying**
16:*13*
40:*11*
**says**
22:*23*
23:*13*
27:*17*
28:*1*, *6*
30:*24*
31:*8*, *16*,
*22*
32:*14*,
*18*, *19*
33:*6*
39:*16*

40:*15*,
*22*   45:*9*
46:*15*
49:*8*
51:*17*
**schedule**
23:*19*
30:*13*
**scheduled**
24:*15*,
*17*   28:*2*,
*3*

**scheduling**
25:*8*
**school**
13:*7*
**Schroeter**
2:*24*
8:*6*
58:*15*, *16*
**scratch**
44:*24*
**screen**
22:*1*, *17*
44:*5*, *6*,
*8*, *17*
45:*2*, *5*
47:*15*
**scroll**
22:*16*
27:*5*
31:*7*
52:*8*
**scrolls**
23:*8*
**Sealey**
37:*16*
**second**
13:*8*
22:*19*,
*21*   24:*7*
27:*8*, *13*

30:*18*,
*24*   31:*7*
48:*14*
**sections**
5:*15*
**security**
35:*16*
**see**
17:*12*,
*17*, *20*
18:*15*
21:*19*
22:*21*,
*25*   23:*8*,
*10*, *14*
24:*8*, *12*
25:*13*,
*15*
27:*15*,
*18*   28:*4*,
*21*, *25*
29:*11*,
*15*
30:*25*
31:*1*, *9*,
*10*, *17*,
*19*, *21*,
*25*   32:*5*,
*8*, *14*, *19*,
*23*
36:*21*
37:*12*
38:*9*, *10*
39:*17*
40:*16*
45:*3*
46:*11*,
*16*   47:*6*,
*8*, *11*, *14*,
*16*, *17*,
*21*, *22*,
*25*   48:*1*
50:*25*

51:*19*
52:*12*
**seen**
29:*11*,
*21*, *25*
54:*14*
**send**
19:*7*
28:*17*
29:*8*
49:*7*
**senior**
20:*1*
42:*6*
**sent**
21:*22*
23:*2*, *22*
30:*14*
33:*5*
34:*5*
40:*12*
53:*16*
54:*12*
**sentence**
20:*25*
47:*9*, *18*
48:*3*, *22*
49:*12*,
*21*, *24*
50:*11*
**sentences**
18:*2*
**served**
18:*5*
**set**
19:*19*
20:*4*
59:*5*
**seven**
12:*18*
**sex**
20:*15*

**share**
22:*1*
27:*3*
31:*2*
35:*10*
**sharing**
43:*11*
**Sheila**
42:*3*
53:*25*
54:*9*, *10*
55:*11*
**Sherrie**
38:*9*, *11*
**short**
46:*8*
**show**
45:*8*
51:*14*
**shown**
44:*3*
**sick**
29:*13*
**sign**
52:*14*
57:*3*
**signed**
52:*19*
**similar**
14:*25*
38:*15*
**sir**
10:*16*,
*22*   11:*3*,
*9*, *13*, *17*
12:*2*, *7*
14:*12*
15:*1*
16:*5*, *21*
23:*1*, *15*
25:*4*
27:*16*
31:*11*

51:*1*
52:*13,*
*20, 23*
**site**
55:*22*

**situations**
26:*4*
**skip**
13:*5*
37:*24*
**slower**
28:*13*
**somebody**
18:*20*
20:*23*
25:*2, 5,*
*17, 18*
31:*14*
32:*11*
33:*18*
36:*13*
38:*21*
45:*4, 6*
55:*1*

**somebody's**
51:*13*
**someplace**
16:*12*
**Sorry**
10:*4*
21:*12*
27:*8*
30:*5*
34:*13*
36:*20*
37:*15*
44:*24*
45:*15,*
*16*   46:*5*
48:*25*
49:*5*

54:*8*
55:*15*
**sort**
13:*5*
17:*2*
**sorts**
36:*2*
**Soto**
37:*18*
**South**
7:*6*
**SOUTHERN**
1:*2*
7:*11*
**space**
28:*7*
**speak**
42:*2*
50:*5*

**specialist**
12:*17*
15:*3, 4,*
*6, 19*
16:*4*
46:*20, 22*
**specific**
54:*16*
**Specifical
ly**
21:*11*
53:*12, 13*
**spell**
9:*3*
**spend**
27:*6*
**spoke**
42:*5*
**spots**
40:*4*
**staff**
15:*22*
25:*7, 23*

31:*15*
37:*1, 8,*
*11, 15*
38:*7*
42:*19*
48:*7, 20*
50:*23*
51:*17*
**stand**
12:*6*
**stands**
19:*18*
51:*23*
**START**
1:*18*
13:*24*
**started**
14:*18*
**starting**
7:*14*
**STATE**
2:*16*
4:*5, 6,*
*7, 8, 9,*
*10, 11,*
*14*   7:*15,*
*24*   8:*11*
9:*3*
22:*2*
24:*5*
30:*21*
39:*7*
40:*10*
43:*13*
44:*17,*
*19, 20,*
*21*
50:*15*
58:*3, 7,*
*17*
**stated**
24:*23*
42:*14*

**statements**
12:*1*
**STATES**
1:*1*
7:*11*
**stationed**
16:*6*
19:*17*
55:*10, 21*
**status**
30:*13*
45:*9, 10*
50:*23*
51:*18*
**step**
19:*9, 14*
**steps**
18:*23*
25:*18,*
*21*
40:*25*
41:*8*
**STEVEN**
1:*7*
**stipulate**
8:*18*

**STIPULATED**
5:*3, 6,*
*9, 12*
6:*3*
8:*20, 21*
**STIPULATIO
NS**   5:*1*
6:*1*
**stopped**
16:*25*
**Street**
2:*3, 10,*
*17*
**stuff**
54:*22*

**Subject**
22:*23*
39:*16*
**successful
ly**   49:*16*
**Suite**
2:*3*
**summary**
44:*5, 6*
**Summit**
58:*4*
**Sunday**
50:*20*

**supervised**
15:*22*
**Supervisio
n**   13:*25*
21:*9*
23:*23*
26:*21*

**supervisor**
23:*6*
46:*19*
55:*22*
**supposed**
33:*10*
**sure**
10:*8*
20:*6*
22:*12*
36:*1*
43:*3*
44:*19*
50:*12*
56:*2*
**swear**
8:*23*
9:*11*
**swore**
58:*9*

sworn
  9:19
system
  17:25
  45:5, 7,
  24   46:1,
  6, 7
  50:23
  51:18,
  21, 22, 24
systems
  46:10

< T >
take
  7:7
  10:24
  11:5, 7
  29:2
  40:25
  41:7
  42:24, 25
taken
  7:9
  8:9
  10:5
  11:10
  12:23
  59:4
takes
  20:4
  25:19
talking
  24:12
  29:21
Tameca
  35:3
T-A-M-E-C-
A   35:3
task
  41:5, 23
  42:15

tasks
  21:18
tell
  10:20
  41:19
  43:16
  44:3
  58:10
telling
  41:21
tells
  44:8

terminated
  49:13
terminatio
n   47:9,
  18   48:2,
  21   50:11
terrible
  25:10
testified
  9:20
  11:18
  12:9, 15
  38:21
  53:23
  54:3

testifying
  10:17,
  19   58:9
testimony
  8:16
  9:11
  11:16
  12:1, 4,
  5, 23
testing
  29:6
text
  6:19
  24:11

  47:14,
  17, 22
Thank
  9:9, 15,
  21, 22,
  24   11:4
  12:14
  31:21
  34:14
  40:6
  54:18
  56:9, 24
Thanks
  43:12
thereof
  59:11
thereto
  5:16
thing
  22:12
things
  36:2
  39:24
think
  12:8, 15
  13:8, 11,
  15
  14:17
  43:21
  46:7
  48:11
  50:19
third
  31:17
  32:21
  45:11
thought
  55:15
three
  15:12
  16:1
Thursday
  28:4

TIME
  1:18, 19
  5:8
  7:4
  10:9
  11:15
  16:19
  18:5, 17
  22:25
  23:7
  26:3
  27:6
  28:11
  29:13
  39:23,
  25   41:2
  43:6, 9
  44:1
  48:17
  49:14
  53:21
  55:20
  57:1
  59:5
timeframe
  20:4
  21:11
times
  12:8, 11,
  14   18:16
title
  14:19,
  25
  24:25
  46:4
today
  11:11,
  16
  28:18
  56:14
Today's
  7:3

told
  41:22
tomorrow
  28:18,
  21
  50:24
  51:18
ton
  42:24
top
  25:13
  33:5
  36:21
  47:11
  50:6

transcript
  56:14
  59:8
transcript
ion
  56:12
transferre
d   34:10
treat
  21:4
treated
  20:22
trial
  5:8
  11:23, 25
trick
  13:10
true
  26:17
  59:7
truth
  9:12, 13
  10:20,
  21   58:10
try   13:5
trying
  18:14

Tuesday
  29:7, 20
two
  29:3, 12
  31:8
  32:6
  47:18
  48:2
  52:14
  54:20
typical
  20:3

< U >
umbrella
  9:8
unavailabl
e   20:10

underneath
  48:2

understand
  10:18
  13:1
  16:9
  17:3
  18:14
  49:23
understand
ing
  17:7, 8
  25:24

Understood
  19:12
  55:16
unit
  23:7
  34:11
  40:14

UNITED
  1:1
  7:11
unlocking
  36:12

unofficial
  24:24
updates
  45:22
updating
  45:24
use
  11:1
  22:7
  35:10
  51:22,
24    52:4
usually
  13:10
  32:6
  50:22
utilized
  5:10

< V >
verificati
on    52:11
versus
  7:9
  18:15
video
  6:14
  10:23
videoconfe
rence
  6:8
  10:18
  58:9
violation
  15:8
  23:7

50:9

< W >
wait
  11:6
waived
  5:5, 14
  57:3
walk
  17:3
Wall    2:3
Wanda
  38:12
want
  11:4
  13:12
  22:17,
18   27:5
  28:3
  38:10
  54:5
WARDEN
  1:7
Warrant
  4:12
  25:22,
24    26:9,
11, 13
  32:18,
25
  41:24
  44:5, 6,
8, 20, 21
  45:2, 3,
7, 8
  46:12
  51:25
  53:20
  54:11,
13, 25
  55:3

warrants
  46:9, 14
  50:22
warrant's
  45:23
wasting
  39:25
way
  13:13
  18:12
  20:13
  25:1, 8
  59:11
ways
  17:23
website
  51:12
Wednesday
  1:17
  29:12,
22, 23,
25    33:7,
12
  39:13,
14    53:18
week
  17:17
weekend
  50:25
well
  11:22
  12:17
  16:13,
16
  19:10
  21:3
  24:24
  26:2, 4
  29:14,
23
  41:12
  44:10
  47:17

49:4
  50:24
  56:22
went
  10:8
  34:21
  35:1
  47:24
  48:12
  49:24
we're
  10:23
  11:6
  27:6
  29:21
  43:8
  48:10,
11, 16
  52:1
we've
  27:11
  33:11
  42:23
white
  40:4
  43:12
William
  33:14
Williams
  27:15
  40:16
Wilson
  1:21
  7:5
  59:3, 17
withdrawn
  26:12
  55:5
  56:7
WITNESS
  1:16
  6:11, 13,
16, 21,

*23, 24*
  8:*23*
  9:*19*
  33:*25*
  34:*4, 15,
18, 25*
  35:*19*
  36:*6, 17*
  54:*19*
**Won**
  7:*22, 23*
**wonder**
  17:*22*
**Wonderful**
  22:*13*
**words**
  11:*1*
  45:*20*
**work**
  16:*10,
11, 23*
  17:*11*
  19:*11*
  21:*2, 3*
  37:*5*
  41:*3, 14*
  43:*18*
**working**
  13:*24*
  14:*7, 10*
  16:*17,
20*   54:*1*
**works**
  19:*6*
  33:*18*
**worksheet**
  48:*22*
**worth**
  29:*3*
**would've**
  39:*20*
  40:*19*

**writ**
  17:*4, 6,
12*
  18:*20,
24*   19:*1,
4, 13, 15*
  20:*22*
  21:*4*
  26:*18*
  31:*17*
  32:*19*
  38:*18*
  44:*16,
17*
  45:*15,
17, 20*
  46:*21*
**write**
  50:*21*
**writs**
  18:*15*
**written**
  6:*10*
**wrong**
  34:*23*
  48:*25*
**W-Y-N-T-E**
  37:*24*
**Wynter**
  37:*24*

**< Y >**
**Yeah**
  16:*15*
  22:*9*
  24:*8, 13*
  27:*11*
  40:*3*
  43:*12*
  52:*4*
  54:*19*
**year**
  13:*6, 20*

**years**
  12:*18*
  15:*12*
  16:*2*
**YORK**
  1:*2, 7*
  2:*4, 9,
11, 16,
18*   7:*7,
10, 12,
21, 23*
  33:*18*
  35:*16,
22*   36:*9,
14*   37:*1,
8, 11*
  38:*7*
  51:*4, 7*
  53:*6, 15*