1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3              INDEX NO. 19-CV-3911

4    - - - - - - - - - - - - - - - - - - x

5    JOEL UVILES, on behalf of          :

6    himself and all others            :

7    similarly situated,               :

8              Plaintiff,              :

9      v.                              :

10   THE CITY OF NEW YORK, and         :

11   ANTHONY J. ANNUCCI, Acting        :

12   Commissioner for the New York     :

13   State Department of Corrections   :

14   and Community Supervision, in     :

15   his official capacity,            :

16              Defendants.            :

17   - - - - - - - - - - - - - - - - - - x

18

19          DEPOSITION OF GWENDOLYN HOGAN

20

21      (This proceeding was conducted via Zoom.

22       All participants appeared remotely.)

23

24   REPORTED BY:  Deanna J. Dean, RDR, CRR

25   JOB NO. 191214

1

2                    Friday, March 19, 2021

3                    1:34 p.m.

4

5

6       Deposition of GWENDOLYN HOGAN, held

7   via Zoom videoconference, before Deanna J.

8   Dean, a Licensed Court Reporter, Registered

9   Professional Reporter, Registered Diplomate

10  Reporter, and Certified Realtime Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3       WERTHEIMER

 4       Attorneys for Plaintiff

 5            14 Wall Street

 6            New York, New York 10005

 7       BY:  JOEL WERTHEIMER, ESQ.

 8

 9       New York City Law Department

10       Attorneys for Defendant City of New York

11            100 Church Street

12            New York, NY 10007

13       BY:  BRIAN KRIST, ESQ.

14

15       Office of the New York State Attorney General

16       Attorneys for Defendant Anthony J. Annucci:

17            28 Liberty Street

18            New York, NY 10005

19       BY:  DEANNA COLLINS, ESQ.

20

21

22

23

24

25
```

```
 1                    Gwendolyn Hogan

 2                P R O C E E D I N G S

 3                  GWENDOLYN HOGAN

 4    a witness called for examination, having been

 5    first duly sworn according to law, was deposed

 6    and testified as follows:

 7                      EXAMINATION

 8    BY MR. WERTHEIMER:

 9         Q.    Good afternoon, Ms. Hogan.  I'm just

10    going to do a few introductory ground rules,

11    just to make our lives easier, before getting

12    into questions.

13              So just as we're doing this, only

14    one of us can speak at a time so that the court

15    reporter can get down each of our -- my

16    questions and your testimony.

17              If you are confused by any question

18    that I ask you, just let me know and I'll try

19    to rephrase it.  If you don't tell me that you

20    are confused, I'll expect that you understood

21    the question.

22              You have to give verbal answers.

23    You can't nod or say "mm-hmm," because the

24    court reporter has to be able to get down your

25    answers.
```

Gwendolyn Hogan

1

2          Do you understand all that?

3     A.    Yes.

4     Q.    And if you need to take a break at

5  any time, just let me know.  Breaks are fine,

6  but if there's a question outstanding, I'm just

7  going to ask that you answer that question

8  before asking to take a break.  Okay?

9     A.    Yes.

10    Q.    Have you ever been deposed before?

11    A.    I don't -- no.  No, I have not.

12    Q.    Have you ever testified in a civil

13 matter before?

14    A.    No.

15    Q.    Have you testified in any criminal

16 matters before?

17    A.    Yes.  I work at parole.  I also

18 worked at ACS and I testified in hearings

19 there.  I worked at probation and I testified

20 in hearings there.

21    Q.    Got it.

22          So you are familiar with testifying,

23 it sounds like?

24    A.    Yes.

25    Q.    Okay.  And did you review any

1                Gwendolyn Hogan

2  documents to prepare for this deposition?

3      A.   Just the exhibits that were sent to

4  me about a half hour ago.

5      Q.   Okay.  Prior to today, did you

6  review any documents?

7      A.   No, I did not.

8      Q.   And without getting into the

9  substance of the communications, did you

10  prepare for this deposition with an attorney?

11     A.   Yes.

12     Q.   And that was Ms. Collins?

13     A.   Yes.

14     Q.   And for how long did you meet?

15     A.   About an hour, if that long.  About

16  60 minutes, maybe a little less.

17     Q.   And that was by phone.  Correct?

18     A.   Correct.

19     Q.   Okay.  And are you located in

20  Brooklyn?

21     A.   Yes.

22     Q.   And do you still work at Brooklyn 4

23  as you did in 2018?

24     A.   Yes.

25     Q.   And are you still a supervising

```
 1                    Gwendolyn Hogan
 2   parole officer?
 3        A.    Yes.
 4        Q.    How many people do you oversee in
 5   your role as a supervising parole officer?
 6        A.    Well, that varies.  Are you asking
 7   me how many I'm supervising currently?
 8        Q.    Yes.
 9        A.    Currently, I supervise nine parole
10   officers.
11        Q.    And in 2000 -- in May of 2018 how
12   many parole officers were you supervising?
13        A.    At that time we were fully staffed.
14   Maybe we had four senior parole officers.  So I
15   was only supervising seven POs.
16        Q.    Okay.  So there are 28 parole
17   officers in Brooklyn 4 at a given time, give or
18   take?
19        A.    Correct.
20        Q.    And so in -- at the time -- at the
21   time you had four people overseeing 28, and now
22   you have about -- you have three people
23   overseeing 28.  Is that correct?
24        A.    Well, it's less than 28 now.  We
25   have actually -- we are very short staffed.  So
```

```
 1                   Gwendolyn Hogan
 2    it's about -- it's about 19.
 3         Q.    Okay.
 4         A.    Or 20.  And there are two CUs right
 5    now covering.
 6         Q.    And in May of 2018, how many
 7    parolees did the parole officers that you
 8    supervised have in their supervision?
 9         A.    Again, that varies, because it
10    depends on what type of parole officer they
11    are.  If they are a specialized parole officer,
12    they would have fewer cases than a regular PO.
13    "Specialized" meaning we cover sex offenders;
14    we have gangs; we have mental health.  So those
15    are all considered specialized case loads, so
16    they are not supposed to carry more than 25
17    cases.
18         Q.    Got it.
19               So the specialized officers have
20    fewer because it is a more intensive job?
21         A.    Correct.
22         Q.    And Ms. Von Evans, who you
23    supervised in 2018, was a regular parole
24    officer.  Is that right?
25         A.    I don't recall.  I would have to --
```

```
 1                    Gwendolyn Hogan

 2    the reason I'm not sure, she did at one point

 3    switch over to be the DV officer, which would

 4    have given her a smaller caseload.  I believe

 5    it was after June -- I mean after this, but I'm

 6    not 100 percent positive.

 7         Q.    That's fine.

 8               How long did you supervise Ms. Von

 9    Evans?

10         A.    Prior to this case we are speaking

11    of or in general?

12         Q.    In general.  What is -- in general.

13         A.    Okay.  Well, here's where that gets

14    tricky, because I was a supervisor in Brooklyn

15    4 from April until June of 2018, at which point

16    I was supervising Ms. Von Evans.  Then I was on

17    loan or loaned out to another bureau that was

18    short-staffed.  So I left Brooklyn 4, so

19    someone else was supervising her, for

20    approximately eight months.  And then I came

21    back -- no, I'm sorry.  The first time was four

22    months.  Then I came back.  I was in Brooklyn 4

23    for about two months, and then I was loaned out

24    again to another bureau --

25         Q.    Understood.
```

```
 1                    Gwendolyn Hogan
 2      A.     -- for eight months.
 3             And by the time I came back, Ms. Von
 4   Evans transferred to Queens.
 5      Q.     Understood.
 6             And so now I want to have you look
 7   at a document that you have titled as Annucci
 8   29.
 9      A.    Okay.  Give me a second.  I have it
10   up.  I just need to open that one.
11      Q.    So do I.
12      A.    Okay.  Yes.
13            MR. WERTHEIMER:  Okay.  And I
14        believe in the last -- should we keep the
15        numbering the same from the last one?  Do
16        we want to do that?
17            MR. KRIST:  Same.
18            MS. COLLINS:  Mm-hmm.
19            MR. WERTHEIMER:  So we marked this
20        one as which one?  5 the last time?  Is
21        that right?  Or 4.
22            I'm sorry.  I was like --
23            THE WITNESS:  No, that's fine.  It
24        gave me a chance to take a drink.
25            MS. COLLINS:  We marked it Exhibit
```

1               Gwendolyn Hogan

2        3.

3               MR. WERTHEIMER:  3?  Okay.  3.

4        Thank you.  Apologies.

5        Q.    Ms. Hogan, do you recognize this

6   document?

7        A.    Yes, I do.  It's the directive.

8        Q.    Okay.  And is this a directive that

9   you review frequently?

10        A.    Well, review frequently, no.

11   However, I was a PRS for two and a half years,

12   so I reviewed it frequently as a PRS, and I

13   only stopped being a PRS approximately two

14   months before this particular case.  So in

15   April of 2018.

16        Q.    When you say "PRS," what does that

17   stand for?

18        A.    Oh, I'm sorry.  That is a parole

19   revocation specialist, the parole division's

20   quote/unquote prosecutor.

21        Q.    Understood.

22               So you prosecuted parole revocation

23   cases before becoming a supervising parole

24   officer?

25        A.    Correct.  So this directive --

1                  Gwendolyn Hogan

2        Q.     So you were --

3        A.     Sorry.

4               This directive was basically our

5    guideline for the whole PVU unit, so I'm

6    familiar with it.

7        Q.     Understood.

8               So I want to direct your attention

9    to the top of that document and just ask you a

10   few questions about the terms in that document

11   as best you understand them.

12       A.     Okay.  Sure.

13       Q.     Okay.  The first thing that I want

14   to ask is, there's a phrase there that says "A

15   supervisor may void a warrant provided the

16   violation warrant has not been enforced."

17              Do you see that?

18       A.     Correct.

19       Q.     What is your understanding of what

20   it means for a violation warrant not to have

21   been enforced?

22       A.     That means if it has not been lodged

23   with corrections.  It's enforced once he --

24   corrections get it and he is lodged.  That is

25   the date that they use for enforcement.

1    Gwendolyn Hogan

2        Q.    Okay.  So let's -- if a parolee

3    violates their parole with a technical

4    violation, not by being arrested but by some

5    other manner that leads to a technical parole

6    violation and a warrant is issued, that would

7    be the enforcement of the warrant.  Correct?

8        A.    No.

9        Q.    No.  Okay.

10       A.    The warrant is issued -- if he's

11   physically in the building, the warrant is

12   issued.  We drive him down to corrections.

13   Corrections, we turn over the body and the

14   warrant.  The warrant is now enforced.

15       Q.    Okay.  Now, in a second scenario

16   where somebody is arrested and being held

17   pursuant to charges and then a warrant is also

18   lodged against them, that is still considered

19   enforced under these terms.  Is that correct?

20       A.    Correct, because it was lodged

21   against him.

22       Q.    Okay.  So the only thing that

23   matters under the terms of this directive is

24   whether it was enforced, not whether it was the

25   only document holding them in a facility.

```
 1                    Gwendolyn Hogan
 2   Correct?
 3        A.    Correct.  Well, in order for it to
 4   be holding him in the facility, it had to have
 5   been enforced.  He cannot be in a facility
 6   without it being enforced.
 7              Now, when you say "facility," do you
 8   mean jail or do you mean the police station?
 9   I'm -- just for clarification.
10        Q.    In jail.
11        A.    Okay.  Then it has to be enforced.
12   There's no way that he could be in jail and it
13   have not been enforced.
14        Q.    Okay.  I just want to just drill
15   down here for one second.  So let's
16   take Mr. Uviles' case.
17              As you understand it, he was
18   arrested on a domestic violence charge.  Is
19   that correct?
20        A.    Correct.
21        Q.    And without the issuance of the
22   parole warrant, as you understand it, would he
23   have been held at Rikers on those charges?
24        A.    I have no idea.  That would have
25   been up to the criminal court.
```

1          Gwendolyn Hogan

2          Q.    Okay.  Suppose he was arrested, or

3    suppose a parolee was arrested before a parole

4    warrant is issued; they were remanded and not

5    given a bail, so they were in jail for the

6    time; and then the parole warrant was issued.

7               In that scenario, that's still

8    enforcement once it's lodged?

9          A.    Correct.  Once -- yes.

10         Q.    Okay.  And turning to the next

11   phrase in that sentence where it says

12   "provided the violation warrant has not been

13   enforced and no delinquency action has been

14   declared."

15              Do you see that?

16         A.    Correct.  Yes, I see it.  I'm sorry.

17         Q.    What does it mean for a delinquency

18   action to have been declared?

19         A.    That means he has to be declared

20   delinquent by the Board of Parole.  There's

21   paperwork that has to be filled out and

22   submitted by the Board of Parole that declares

23   him delinquent.  That basically stops the

24   parole time.

25         Q.    And is that -- how does the Board of

```
 1                 Gwendolyn Hogan
 2     Parole consider whether to declare an
 3     individual delinquent?
 4          A.    Well, they are -- they are two
 5     separate ways, I guess, for lack of a better
 6     term.  If someone is an absconder, meaning we
 7     don't know where they are, we will issue the
 8     warrant to -- the senior will do a bureau
 9     analysis, the bureau chief will sign off on it,
10     we will submit the paperwork to the Board of
11     Parole, and they will agree that a warrant
12     should be issued and it would declare him
13     delinquent.  So he would already be in the
14     system.  He would already be declared
15     delinquent.  If he was picked up at a later
16     date and the warrant fell on him at that point
17     and he was lodged, he was already declared
18     delinquent.
19               Do you understand that part?  Like,
20     am I clear?  That's only one scenario.  I just
21     want to make sure that --
22          Q.    I think -- I think I believe that.
23     Okay.  Or understand that.
24               What is the second scenario?
25          A.    So the second way is if we write a
```

1        Gwendolyn Hogan

2   warrant basically like in this case, a new

3   arrest warrant, we would do the warrant.  The

4   person would serve him -- would get served --

5   and this is just general.  A person would get

6   served.  They would elect to have a prelim or

7   not have a prelim.  If they elected to not have

8   the prelim and it goes straight to the final,

9   then the bureau analysis would be done and he

10  would be sent off and the board would declare

11  him delinquent.

12            If he elects to have a prelim, we do

13  not declare them delinquent right away because

14  if we lose the prelim, the warrant is thrown

15  out.  But if they get probable cause and he's

16  held over for a final, then it comes back to

17  the senior who then does a bureau analysis.  It

18  is submitted to the bureau chief who signs off

19  on it and sends it to the Board of Parole and

20  he gets declared delinquent.

21       Q.    Okay.  So until there is a

22  preliminary hearing, if it has not been waived,

23  then there is not a delinquency action that has

24  been declared.  Correct?

25       A.    In the case of a new arrest,

1                 Gwendolyn Hogan

2    correct.

3         Q.    Of a new arrest, say non-absconder?

4         A.    Correct.  That's a better term, yes.

5    The non-absconder.

6         Q.    Okay.

7         A.    Sorry.  I'm just going to turn the

8    ringer off my phone.  That's why I'm looking

9    down.

10              Go ahead

11        Q.    That's fine.

12        A.    I just heard it beeping.  I'm like

13   let me turn that off.

14              Okay.

15        Q.    Okay.  And in that scenario where

16   the delinquency has not been declared, how

17   is -- how did a warrant be vacated?

18        A.    We have to do a bureau analysis,

19   submit -- requesting that the warrant be lifted

20   or cancelled, and we have to give a reason:

21   untimely service; incurable defect; there is

22   not enough time to give them a hearing.  Those

23   are some of the reasons that they would be

24   cancelled, and it has to be sent over to -- the

25   bureau chief has to sign off on it.  It gets

```
 1                    Gwendolyn Hogan

 2   sent over to PBU or the Board of Parole, and

 3   then they would sign off agreeing to lift the

 4   warrant, because at that point it's already in

 5   their system.  And then a parole officer --

 6   once we get the paperwork back saying that the

 7   warrant can be lifted, a parole officer has to

 8   go to whichever facility the person is being

 9   held with a warrant lift form to give to the

10   Department of Corrections, who will then take

11   our warrant off the body.  And he can -- he's

12   free to leave.

13        Q.   So it's your understanding that

14   until the -- until DOCCS lifts the warrant, the

15   City DOC cannot release a parolee.  Is that

16   correct?

17        A.   Not on ours, yes.  But that's

18   correct.  We have to give them the paperwork.

19   DOC can't just let them out without our

20   paperwork.

21        Q.   And what is -- where did you gain

22   that understanding?

23        A.   Which understanding?

24        Q.   That DOC has to receive your

25   paperwork in order to release a parolee on a
```

1              Gwendolyn Hogan

2   parole warrant.

3        A.    From experience from working here.

4   From having correction officers call and say,

5   "This guy says his warrant is lifted," and

6   we're like, "No, it's not."  And, actually,

7   also, like I said, from being a PRS, I am aware

8   of the warrant lift forms, because sometimes in

9   the hearing process the warrant is lifted right

10  then and there.  So we have to fill out the

11  form and give it to corrections right then and

12  there, and it is attached to what they call the

13  movement card, and they know that when this

14  person gets back to the facility, they process

15  him out.

16       Q.    So your understanding is that New

17  York City Department of Corrections' policy is

18  not to release an inmate until they have

19  received the warrant lift from DOCCS?

20       A.    Well, an inmate in on our warrant,

21  correct.

22       Q.    Okay.

23       A.    I just want to make that clear.  If

24  they're being held only on our warrant, then

25  they cannot be released until we give them the

1          Gwendolyn Hogan

2   warrant lift form.

3        Q.    Okay.  I guess my question is is

4   that a city policy, in your understanding, or a

5   state policy, in your understanding, or both?

6        A.    I will say that that is what we are

7   required to do here at this job.  I can't tell

8   you what the city policy is, because I don't

9   work for them.  I just know that in order for a

10  parolee to be released from New York City

11  Corrections, and they're only held on our

12  warrant, he cannot be released until we give

13  them the warrant lift form which basically

14  cancels out the warrant.

15       Q.    And you said in your experience

16  you've received calls from employees at the New

17  York City Department of Corrections asking you

18  to lift warrants or -- or about the status of a

19  warrant lift for an inmate who is claiming that

20  they should be released?

21       A.    Correct.

22       Q.    And the New York City Department of

23  Corrections' employees communicate to you that

24  they can't let the inmate out until you provide

25  them with the form.  Correct?

Case 1:19-cv-08565-AS Document 54-12 Filed 11/27/23 Page 22 of 56 #: 2500

1                    Gwendolyn Hogan

2          A.    Well, the question is usually, you

3    know, this guy is saying his warrant was

4    lifted.  He's supposed to get out.  You know,

5    is that the case?  And we'll look in the

6    computer and we'll see.  No, his warrant wasn't

7    lifted.  He's not getting out.

8                However, has anybody ever asked me

9    on the phone for a warrant lift form?  No.

10         Q.    They have not asked you, but they've

11   said -- in your experience, you've -- excuse

12   me.  Strike that.

13               You have received calls in your time

14   as a supervising parole officer from DOC city

15   employees asking -- communicating that inmates

16   have said their warrant was supposed to be

17   lifted, and asking you about the status of the

18   warrant lift?

19         A.    Yes.

20         Q.    Okay.  Thank you for following along

21   with me there.

22               So from this directive -- I'm

23   looking at E2 now.

24         A.    Okay.

25         Q.    So this is after enforcement of a

1          Gwendolyn Hogan

2    warrant but prior to the preliminary hearing or

3    waiver of such hearing, a board member may

4    vacate a warrant upon a request.

5          So this -- do you see that paragraph

6    there?

7    A.    Yes.  Yes.

8    Q.    Okay.  So this scenario is where a

9    parole hearing date has been set and it hasn't

10   been waived -- this is an example.  It's been

11   set, it hasn't been waived, and then you

12   decide, for whatever reason, to request that a

13   warrant be vacated.  You would have to fill out

14   this supplementary violation of release form

15   and send it to the board.  Correct?

16   A.    Correct.  Well, we have this -- it

17   would be a -- the supplemental violation of

18   release report, the parole officers actually

19   fill out.  I would do the bureau analysis form,

20   the whole packet would go together, and it

21   would be submitted to the bureau chief, who

22   then forwards it to the board.

23   Q.    Okay.  So turning back to E1, and

24   looking at the first sentence, what -- excuse

25   me.

```
 1                    Gwendolyn Hogan
 2              Is there anything in this directive
 3    that indicates that the board is required to
 4    void the warrant and not merely a supervise --
 5    not to say "merely" -- but that it can't be
 6    voided just by a supervising parole officer?
 7              MS. COLLINS:  Objection to the form.
 8              This is not the complete directive.
 9         It's just a page.
10              MR. WERTHEIMER:  Understood.  I'll
11         rephrase it.
12         Q.    Can a supervising parole officer
13    void a warrant where no delinquency has been
14    declared without the Board of Parole --
15         A.    Not if it has already --
16         Q.    -- signing off on that voiding of
17    the warrant?
18         A.    Sorry.
19              Not if that has already been
20    enforced.  If we wrote a warrant and it's in
21    the system -- I'll use an example of an
22    absconder, because that's easiest.  If we wrote
23    an absconder warrant and we didn't know where
24    he was, and then we get a call from a program
25    that says, hey, he's in a program, he's been
```

1          Gwendolyn Hogan

2    here for so-and-so months, and we can prove

3    that he was in a drug rehabilitation program,

4    that warrant hasn't been enforced.  We can then

5    lift it.  We can get rid of it.

6         Q.    So your understanding is that where

7    it has neither been enforced nor a delinquency

8    action declared, then you may void it?

9         A.    Yes.

10        Q.    But if -- okay.

11              You'll have to bear with me as I go

12   through this here.

13        A.    No, that's fine.

14        Q.    I am required to jump through a

15   number of my screens.

16        A.    I'm going to step away for just a

17   second because the phone is dying.  I want to

18   plug it in.

19        Q.    Okay.

20        A.    Okay.  I think I should be good now.

21   I don't want to go through all this and get on

22   the phone and get on the line just to have it

23   die.

24        Q.    Okay.

25        A.    Okay.  Now it's charging.  Okay.

1          Gwendolyn Hogan

2     Q.    I want to turn now to -- you

3   received a document that's titled Annucci

4   20-14.

5     A.    Okay.  Yes.

6          MR. WERTHEIMER:  And this is -- I

7     believe we marked this as Exhibit 2.

8     Correct?

9          MS. COLLINS:  Yes.

10    Q.    Okay.  Ms. Hogan, do you recognize

11  this type of printout?

12    A.    Yes.

13    Q.    And this is a printout from the

14  Chronos system or CMS.  Is that correct?

15    A.    Yes.

16    Q.    And I want to turn to the page

17  that's the second page of the PDF.  It's

18  Annucci 19.

19    A.    Okay.

20    Q.    And I want to go to the -- I'm

21  sorry -- to Annucci 17.

22    A.    Okay.

23    Q.    And to the bottom there.

24    A.    Mm-hmm.

25    Q.    This was an entry you made.

```
 1                    Gwendolyn Hogan
 2   Correct?
 3        A.    Yes.  The very last one.
 4        Q.    The very last one, yes.  That's the
 5   one I --
 6        A.    Yes.
 7        Q.    Although you review the CMS and
 8   Chronos entries for -- or at the time reviewed
 9   them for Ms. Von Evans.  Correct?
10        A.    Yes.
11        Q.    And would you -- were you required
12   to review all of the CMS and Chronos entries
13   for the parole officers that you supervised?
14        A.    I'm required to do case conferences
15   once a month with all the parole officers that
16   I supervise.  Part of the case conference is
17   going over the notes, seeing what has been
18   done, what needs to be done.  So that's why you
19   will see SPO review all has the same date
20   because it's the case conference date.
21        Q.    Understood.
22              So you would go through all of the
23   entries at one time?
24        A.    Not all of them, but I review them.
25   I'm not going to say every one, but we -- I
```

1          Gwendolyn Hogan

2   read them, go through them, see what needs to

3   be done.

4          Q.    Okay.  Now, in this case, you put in

5   an entry that says that a bureau analysis was

6   submitted canceling delinquency due to untimely

7   service.

8          A.    Yes.

9          Q.    What led you to cancel for untimely

10  service in this case?

11         A.    Because it was brought to my

12  attention by PO Von Evans that he was arrested

13  and had not been served.  So it was past three

14  days that we are allowed to do service, so

15  therefore we had to cancel delinquency.

16         Q.    When you say three days -- excuse

17  me.  Strike that.

18              What was Mr. Uviles required to be

19  served with?

20         A.    His violation of parole paperwork

21  and the hearing paperwork.  It's called a

22  notice of violation.  He's supposed to be

23  served with the actual violation report, the

24  notice of violation, at which time he would be

25  asked if he wanted a prelim or a final, and

Case 1:19-cv-08565-AS Document 55-1 Filed 11/27/23 Page 29 of 56 #: 2507

1                    Gwendolyn Hogan

2    that is the paperwork that he is required to be

3    served with.

4         Q.    And that report is known as a 9011.

5    Is that correct?

6         A.    The one-page piece of paper is known

7    as a 9011.  The rest of it is the VOP or

8    violation of release report.

9         Q.    And if the violation of release

10   report is -- is not served on the parolee

11   within the three days, what steps are you

12   required to take as the senior parole officer?

13        A.    Well, first, we would have to know

14   why he wasn't served within three days.

15   Because certain things like he was sick, he was

16   unavailable, corrections had issues meaning

17   like the jail was on lockdown, things that were

18   not in our control, then we would -- we still

19   continue on.

20              However, if it was nothing that was

21   beyond our control and it just didn't get done

22   for whatever reason, I as the senior parole

23   officer is then required to do the bureau

24   analysis by conferencing with the bureau chief.

25   But we do the bureau analysis to vacate the

Gwendolyn Hogan

warrant so that this person could be let out.

Q. Are you required to communicate anything to the City Department of Corrections in this case?

A. At that point, no.

Q. Okay. And is it your understanding that failure to serve the violation of parole papers does not impact the validity of the warrant itself?

MS. COLLINS: Objection. But you can answer.

You can answer, Officer.

THE WITNESS: Oh, I'm sorry.

A. I don't understand the question.

Q. Let me ask it a different way.

The parole warrant is a separate document from the violation of parole papers. Correct?

A. Correct.

Q. And a parole warrant is -- well, let me -- strike that.

Let me ask, how does a parole warrant get issued by your office?

A. I'm not understanding -- I don't

```
 1                   Gwendolyn Hogan
 2   understand what you mean by how does it get
 3   issued.  What do we base it on or how is it
 4   physically done?  I'm not understanding the
 5   question.
 6        Q.    I'm asking how is it physically
 7   done?
 8        A.    There's a book with warrants in it.
 9   It's called a warrant book.  You get it.  You
10   fill out the name, the NYSIN number, the DIN
11   number.  The senior parole officer signs off on
12   it, and then we input it into our system, our
13   violator system on TMS -- not TMS.  I'm sorry.
14   On mainframe.  There is what's called the
15   violator system.  We have to input the warrant,
16   the information on the warrant, what kind of
17   warrant it is, what the charges are, and we
18   input it into the system.
19        Q.    And when you input it into the
20   system, does that communicate the information
21   to other agencies?
22        A.    If it is an absconder warrant, then
23   it is entered into the DOC -- DO -- the
24   Department of Justice, and they would go on as
25   a want.  So it would go across all law
```

```
 1                 Gwendolyn Hogan

 2    enforcement, so they know that this gentleman

 3    is wanted -- or lady -- I'm sorry; that's

 4    sexist -- this person is wanted by New York

 5    City DOCCS.

 6                 If it's a technical warrant, that's

 7    for our system only so that we know that we

 8    have a warrant.  It does not go to any other

 9    systems until we physically enforce it.

10        Q.    Okay.  So let's go up to Annucci 20.

11    That's the first page of the document.

12        A.    Okay.  Yes.

13        Q.    So I'm looking at the large entry

14    from 5/22 -- 5/20/18 from Johnny Ortiz where

15    you are the supervising parole officer.

16                 Do you see that?

17        A.    I am not the supervising parole

18    officer.  Von Evans' name is listed as the

19    parole officer because it is her case.  So

20    anytime anybody makes an entry in there, you

21    will see my name and Von Evans' name, but the

22    person who made the entry is -- you know, it

23    will say "entered by."

24                 So I am not Mr. Ortiz's supervising

25    parole officer, just for clarification.
```

```
 1                  Gwendolyn Hogan
 2        Q.     Understood.  Understood.  Okay.
 3               So at the case conference for
 4   Mr. Uviles, did you review this entry as the
 5   supervising parole officer for Ms. Von Evans?
 6        A.     This entry occurred prior to 6/12.
 7   So, no.  I did not -- I'm not understanding the
 8   question.  Maybe you should ask it another way.
 9        Q.     Well, you said prior to 6/12.  What
10   happened on 6/12 such that you would be -- you
11   began reviewing entries in this action?
12        A.     It's just a day I pick to do case
13   conferences.  I have a month, I schedule a PO a
14   day, and I do case conferences.  There was
15   nothing particularly special about 6/12.
16        Q.     Okay.  So at the bottom of that
17   entry that we were just looking at where it
18   says "SPO review, 6/7/2018," that is not
19   referring to your review of the entry?
20        A.     I don't believe so.  I'm not -- no.
21        Q.     Okay.  Looking at this entry -- and
22   this just if you have an understanding.  If you
23   do not, that's okay -- it says the warrant
24   0807930 was issued and emailed to the 18th
25   precinct officer.
```

```
 1                    Gwendolyn Hogan
 2        A.     Mm-hmm.
 3        Q.     Is your understanding that emailing
 4   the warrant, the parole warrant, gives that
 5   officer sufficient authority to hold a parole
 6   violator?
 7             MS. COLLINS:  I'm going to object to
 8        that question, but you can answer.
 9        A.     It's not really a yes-or-no
10   question.  Yes, we send it -- common practice
11   is when -- this is actually -- he works in
12   CSOP, which is the overnight unit, so his
13   supervisor is Stanley.  But the common practice
14   is, if we know what's to hap -- what's going
15   on, which we did, they contact the police
16   station, find out the details.  When it's
17   determined that a warrant would be issued, one,
18   it would be sent over to the arresting officer;
19   or if he had already left the precinct and gone
20   to central booking, which is usually more the
21   procedure, we send it over to central booking
22   so that he would not get released.  So, yes.
23        Q.     After that process where it's sent
24   over to central bookings, is typical practice
25   to then go physically deliver the warrant?
```

```
 1                  Gwendolyn Hogan
 2       A.    No.
 3       Q.    Okay.  So it's communicating the
 4  warrant electronically --
 5       A.    Correct.
 6       Q.    -- is the typical practice?  Okay.
 7             When a parolee is then -- in a
 8  scenario where a parolee is then transferred to
 9  Rikers Island and held there pending charges,
10  is the typical practice then to bring a copy of
11  the warrant to Rikers Island?
12       A.    Just for clarification, are you
13  saying that the person at Rikers did not
14  already have a warrant from parole on them?
15       Q.    Correct.
16       A.    Then, yes, we would physically take
17  the warrant with us and give it to the general
18  office so that they would know that there's a
19  parole hold on him and not release him.
20       Q.    Okay.  Thank you.
21       A.    I'm sorry.  Can I just add that
22  generally is because the person is already in
23  there on some type of bail, and we found out at
24  a later date, oh, he's in jail.  So now we
25  would go before he, you know, can bail out or
```

```
 1                  Gwendolyn Hogan
 2   get out, take the physical warrant over so that
 3   they know he hasn't been paroled.
 4        Q.    Is it your understanding that you're
 5   required to bring the physical warrant to
 6   Rikers?
 7              MS. COLLINS:  Objection.
 8              You can answer.
 9        A.    No.  We are not -- we are not
10   required to bring the physical, as long as they
11   have a copy of the warrant, whether it gets
12   there electronically or physically.  We are not
13   required to take it physically.
14        Q.    Okay.
15              I actually need to take a quick
16   break.  I apologize.  I just need a few
17   minutes.
18              MR. WERTHEIMER:  We can go off the
19        record.
20              (Recess taken from 2:15 p.m. to
21              2:17 p.m.)
22   BY MR. WERTHEIMER:
23        Q.    Okay.  So, Ms. Hogan, on June 7,
24   2018, you submitted a bureau analysis for
25   Mr. Uviles canceling his delinquency.  Correct?
```

```
 1                  Gwendolyn Hogan

 2      A.    Correct.

 3      Q.    And you emailed that to Barbara

 4  Felder.

 5            Who is Barbara Felder?

 6      A.    Barbara Felder is the clerical

 7  office assistant or the -- I don't mean

 8  whatever.  I don't want to be disrespectful of

 9  her title, because she's like an MPVU.  So that

10  is who we send paperwork to to get it

11  processed.  That's the term we use to get it

12  sent it to the commissioners, get it declared

13  delinquent, to get what we need done done.

14      Q.    What is the process between when

15  you -- to your understanding, what is the

16  understanding from when you send a bureau

17  analysis to cancel a delinquency to the

18  delinquency being cancelled?

19      A.    I don't know what they do.  We just

20  send it.  I'm not sure when it gets there what

21  they do with it, and we wait for the analysis

22  to come back and says yes, signed off on by the

23  commissioners.

24            So I don't really -- I guess the

25  answer is I don't know their process.
```

Case 1:19-cv-08565-AS Document 54-5 Filed 11/27/23 Page 68 of 56 #: 2516

```
 1                    Gwendolyn Hogan

 2         Q.    Okay.  How long does it typically

 3    take from when you submit a bureau analysis

 4    canceling a delinquency to when it is received

 5    back from the commissioner's office, either

 6    approving or disapproving?

 7         A.    I don't have an exact time or -- it

 8    depends on when we send it, like meaning if

 9    it's the weekend, how many commissioners are

10    around that can sign off on it.  So I don't

11    really have a -- I'd say a week, a week and a

12    half is the latest, and I'm going to say as an

13    extreme being the latest.  Because, again, I

14    don't know what they do there.  But I do know

15    that sometimes they have to find three

16    commissioners.

17         Q.    So your understanding is that three

18    commissioners are required to cancel a

19    delinquency?

20         A.    That is my understanding, yes.

21         Q.    Is there -- in your typical

22    practice, is there an amount of time that would

23    go by from when you submitted a delinquency to

24    when you would follow up to find out the status

25    of that -- sorry -- submit a cancellation of
```

```
 1                 Gwendolyn Hogan
 2   delinquency to follow up on the status of that
 3   cancellation?
 4             MS. COLLINS:  Objection to the
 5        foundation, but you can answer.
 6        A.    Sorry.  I understood the question.
 7   Again, it would depend on what was going on.
 8             Sorry.  I don't know what just
 9   happened.
10             I would say at most maybe a week.
11   It depends on like if it's a holiday week or --
12   but at least -- I'd say at least a week,
13   because I'm like, well, what's going on?  Why
14   haven't I heard back from you guys?  Or --
15   yeah.  About a week.
16        Q.    In Mr. Uviles' case, after you
17   submitted the cancellation of delinquency
18   paperwork on June 7th, what was the next time
19   that you followed up on the cancellation of his
20   delinquency?
21        A.    Give me a second.  I'm sorry.
22             I don't recall the exact date.  I
23   can say that I know Ms. Von Evans brought to my
24   attention that, you know, it still has a --
25   he's still there.  You know, what's going on?
```

```
 1              Gwendolyn Hogan
 2   Why hasn't it been lifted?  So I don't recall
 3   the exact date.  But once she brought it to my
 4   attention, I reached out to Ms. Felder.
 5        Q.    And did Ms. Felder give you any
 6   information in response to your communication
 7   to her?
 8        A.    The issue was that it was not a
 9   complete package, so that's why it had not been
10   signed off on, and she told me what needed to
11   be done.  Ms. Von Evans needed to do a whole
12   VOP, a whole violation of release report, and
13   she took care of it.  Well, I told Ms. Von
14   Evans and then she took care of it.
15        Q.    Initially, you did not believe that
16   a violation of release report was required in
17   this case.  Correct?
18        A.    Correct.
19        Q.    And what was the basis of that
20   belief?
21        A.    Well, it was twofold.  One, it was a
22   prior PRS, and as a PRS, I would just do the
23   delinquent, the bureau analysis or the PRS
24   analysis -- it's the same basic thing -- send
25   it in and they would sign off on it.  So I just
```

```
 1                    Gwendolyn Hogan
 2   did one, like, two months ago, so why would it
 3   be different?  In my mind, anyway.
 4                    And that the other thing that the
 5   directive that you mentioned says a
 6   supplemental violation of release report.  He
 7   wasn't violated, meaning there was no violation
 8   of release report at that time, and we weren't
 9   going to violate him.  We were just trying to
10   get the warrant off.
11        Q.    And did Ms. Felder explain -- give
12   you a reason why a violation of parole package
13   was required?
14        A.    That is what they were refer -- it's
15   part of policy.  It's part of the directive.
16   When they put supplemental violation of release
17   report, it should actually say violation of
18   release report and/or supplemental.
19        Q.    Got it.  Okay.
20                    Did you receive any direct
21   communications from Mr. Uviles himself
22   regarding his incarceration at Rikers?
23        A.    Not that I recall.
24        Q.    Did you receive any communications
25   directly from his family members regarding his
```

1          Gwendolyn Hogan

2    incarceration at Rikers?

3         A.    Not that I recall.

4         Q.    Did you receive any direct

5    communications from attorneys working for

6    Mr. Uviles regarding his incarceration?

7         A.    I did.  I got an email, I believe,

8    from -- his PVU has their own -- the parole

9    defense unit, I believe it's called.  The

10   attorney that represents -- was representing

11   him gave me a call inquiring, and I explained

12   that it was submitted, the bureau analysis was

13   submitted, and we were waiting to hear back.

14              MR. WERTHEIMER:  To the extent there

15         is an email from his attorney, Deanna, I'd

16         just ask for it to be produced to us.

17              MS. COLLINS:  Understood.

18        Q.    And the substance of the

19   communications from the attorneys was asking

20   when he would be released.  Is that correct?

21        A.    Pretty much.  Why was he still in;

22   he had been held in for a certain amount of

23   days.

24        Q.    Did you ever receive any

25   communications directly from New York City

1                  Gwendolyn Hogan

2   Department of Corrections staff in this?

3        A.    No, not that I recall.

4        Q.    Did you ever communicate directly to

5   anybody directly at New York City Department of

6   Corrections --

7        A.    No.

8        Q.    -- with regard to this action?

9        A.    No.

10       Q.    Did you ever instruct Ms. Von Evans

11  to communicate any information to the New York

12  City Department of Corrections with respect to

13  Mr. Uviles?

14       A.    No.

15       Q.    Did anybody from the Board of

16  Correction ever communicate to you that the

17  delay in the cancellation of Mr. Uviles'

18  delinquency was the result of a lost fax?

19       A.    No.

20       Q.    Did anybody ever communicate to you

21  that the cause of the delay in the cancellation

22  of Mr. Uviles' delinquency was the result of

23  commissioners being on vacation?

24       A.    No.

25       Q.    Did you ever have conversations with

1              Gwendolyn Hogan

2   Bureau Chief Jeffreys in regard to this case?

3      A.   Yes.

4      Q.   When were those conversations?

5      A.   Prior to June 7th when I did the

6   analysis, or probably on June 7th, because he

7   has to sign it.  So I explained to Mr. Jeffreys

8   that I needed to do the analysis for Mr. Uviles

9   and why.  He said, "Okay.  When you finish it,

10  give it to me," so he could sign off on it.

11     Q.   I want to turn your attention to the

12  document that was sent to you titled Annucci

13  2-3.

14     A.   Okay.

15        MR. WERTHEIMER:  Now, I believe this

16       document, we marked as Exhibit 4 in the

17       prior deposition.  Correct?

18        MS. COLLINS:  Correct.

19        MR. WERTHEIMER:  Okay.  Thank you,

20       Deanna.

21     Q.   Ms. Hogan, is this the document to

22  which you were just referring?

23     A.   This is the bureau analysis -- a

24  copy of the bureau analysis that I signed on

25  June 7th, yes.

1          Gwendolyn Hogan

2     Q.    And Bureau Chief Jeffreys, that's

3  James L. Jeffreys at the bottom.  Correct?

4     A.    Correct.

5     Q.    And you marked at the top of the

6  document "no delinquency."

7     A.    Mm-hmm.

8     Q.    And "no new special conditions."

9     A.    Correct.

10    Q.    What is the difference between no

11  delinquency there and cancelled delinquency?

12    A.    It's not much difference.  It could

13  have been either one, because if you see, it

14  says cancel delinquency, untimely hearing,

15  incurable defect.  So no delinquency, lift

16  warrant, cancel -- it's not really that much of

17  a difference.  To my knowledge, it's not that

18  much of a difference.

19          The one major difference is that at

20  this point there was a warrant issued, so we

21  had to cancel it or lift it.  If you see where

22  it says "cancel delinquency," there's nothing

23  mentioning a warrant.

24    Q.    Understood.

25          Are you aware of whether Mr. Uviles

```
 1                   Gwendolyn Hogan
 2   did enter into other special conditions after
 3   this was submitted?
 4        A.    I don't understand the question.
 5        Q.    On June 10th, did you instruct Ms.
 6   Von Evans to go meet with Mr. Uviles at Rikers
 7   Island?
 8        A.    I don't remember.
 9        Q.    Did you instruct Ms. Von Evans to
10   ask Mr. Uviles to enter into additional special
11   conditions of his parole?
12        A.    If your question is was he given
13   additional special conditions after he was
14   released, the answer is yes.  Because it was a
15   domestic violence case, he would be given the
16   condition not to have contact with the victim.
17        Q.    Were you aware of whether he agreed
18   to that on June 10th?
19        A.    I don't recall.
20        Q.    Okay.  When -- strike that.
21              Are you aware of whether Ms. Von
22   Evans met with Mr. Uviles on Rikers Island in
23   June of 2018?
24        A.    I would have to look at the notes.
25   I really do not remember.
```

1                     Gwendolyn Hogan

2         So if you want me to look at the --

3     Q.    No.  I'm only asking for your

4 personal recollection.

5     A.    Okay.  Sorry.  It was almost three

6 years ago.  I --

7     Q.    I understand.

8         Other than the instances of you

9 communicating with the Board of Correction

10 regarding the cancellation of the delinquency

11 in this case that we've already spoken of, did

12 you have other communications with them

13 regarding Mr. Uviles?

14     A.    No.

15     Q.    And did you have any

16 communications -- you may have already answered

17 this, and I apologize if so.  But did you have

18 any communications, whether written or on the

19 phone, with anybody from New York City

20 Department of Corrections regarding Mr. Uviles?

21     A.    No, I did not.

22     Q.    Give me one second.

23         Are you aware of any circumstances

24 under which a parolee would be released from

25 DOC custody prior to a warrant lift being

```
 1                   Gwendolyn Hogan

 2    authorized by the Board of Correction?

 3        A.    I -- no, I don't know.

 4        Q.    To go back to Ms. Felder, where was

 5    she located?

 6        A.    Her office is in Manhattan, 340

 7    West -- 340 -- no.  314 West 40th Street.

 8        Q.    And is that a sort of a regional

 9    office --

10        A.    It's the Manhattan area.

11        Q.    -- that over -- sorry.  Go ahead.

12              It's the Manhattan area office?

13        A.    Yes.  That is where PVU is located.

14        Q.    So any cancellation of delinquency

15    in any of the Brooklyn offices would go to PVU,

16    and that would be communicating from PVU to the

17    Board of Corrections?

18        A.    Correct.

19              MS. COLLINS:  Joel, I think you mean

20         Board of Commission -- or Parole Board

21         of --

22              MR. WERTHEIMER:  Yes, I did.  Thank

23         you.

24        A.    I understood.

25        Q.    Department of -- DOC, DOCCS, BOC.
```

1                      Gwendolyn Hogan

2          Does DOCCS maintain any systems to

3  track pending cancellations of delinquencies?

4      A.    When you say "DOCCS," you mean

5  parole, like D-O-C-C-S?

6      Q.    Yes.  Yes.

7      A.    Okay.  Because both entities are on

8  the phone, and before you were referring to

9  DOCCS.

10     Q.    Yes.

11     A.    I believe PVU has a system, but I'm

12  not sure.  I do know in the Brooklyn area

13  office when we send stuff out, there's a log

14  book that it's signed in and it tells you

15  exactly when it went out.

16     Q.    And is there any system in place in

17  the Brooklyn area office, you know,

18  regarding -- regarding the -- strike that.

19         In the Brooklyn area office, do you

20  have a procedure through which you follow up on

21  any cancellation of delinquency that uses that

22  log book to ensure the timeliness of the

23  cancellation?

24     A.    Not to my knowledge.

25         MS. COLLINS:  Just note my belated

1          Gwendolyn Hogan

2      objection to timeliness.  But -- sorry.  I

3      couldn't hit "unmute" fast enough.

4          MR. WERTHEIMER:  I don't think I

5      have anything further, unless after Brian's

6      questions or your questions, Deanna,

7      something comes to mind, or from those

8      questions.

9              EXAMINATION

10  BY MR. KRIST:

11      Q.    Officer Hogan, the same basic

12  instructions that Mr. Wertheimer was saying

13  before.  If there's anything that I say that

14  you need clarification on, just keep asking me

15  to clarify until I get it clear for you.  All

16  right?

17      A.    Okay.

18      Q.    If one of your parole officers

19  communicated to City DOC that a warrant was

20  being lifted or that your office was asking for

21  it to be lifted, is that something that you

22  would expect to be documented in either Chronos

23  or CMS?

24      A.    Yes.

25      Q.    Is that an expectation on your part

1                    Gwendolyn Hogan

2    just as a supervisor, is this something you do,

3    or is that a parole policy?

4         A.    That is a parole policy.  Everything

5    is to be documented in CMS.

6         Q.    And Ms. Hogan, to clarify, what is

7    your -- if you understand, is there any

8    difference between a hold and a warrant for --

9    a parole hold and a parole warrant at DOC?

10        A.    To my knowledge, there's no

11   difference.

12        Q.    And to your knowledge, when was the

13   warrant lifted in this case?

14        A.    I believe it was June 28th.

15        Q.    And the New York City Department of

16   Corrections, does City DOC have any role in the

17   process of getting a parole warrant lifted?

18        A.    I don't understand your question.

19        Q.    You were explaining a little bit

20   before -- and correct me if I'm wrong -- how

21   your office goes about getting a parole warrant

22   lifted.  Correct?

23        A.    Correct.

24        Q.    Is there -- in any part of that

25   process, is the City Department of Correction

1          Gwendolyn Hogan

2    involved in getting a warrant lifted?

3          A.    Oh.  No, not at all.

4          Q.    Any agency of the City of New York?

5          A.    No.

6          Q.    Any officers or employees of the

7    City of New York?

8          A.    No.

9          Q.    Is it fair to say it's entirely a

10   state process?

11         A.    Correct.  Until we walk in with the

12   warrant lift form, the City of New York or DOC

13   is not involved.

14         Q.    And to your understanding, is DOC

15   required to keep custody of people on the

16   warrants while a warrant is still active?

17         A.    Yes.

18         Q.    And to your knowledge, does City DOC

19   have any discretion on that issue?

20         A.    No.

21              MR. KRIST:  I don't think I have

22         anything else.

23              THE WITNESS:  Can you hold on a

24         second?

25              Okay.  Go ahead.

1              Gwendolyn Hogan

2         MS. COLLINS:  I just have a couple

3      of follow-ups.

4                   EXAMINATION

5  BY MS. COLLINS:

6         Q.    Officer, I believe you mentioned

7  that everything needed to be documented into

8  CMS regarding a case?

9         A.    Correct.

10        Q.    By "everything," what do you mean?

11        A.    Any actions that is done on a case.

12  Any phone calls.  Any contacts.  Anything you

13  do in connection to that parolee is supposed to

14  be put into CMS.

15        Q.    You also mentioned, going back a

16  ways, that if a parolee did not already have a

17  warrant on him, then you would physically go to

18  Rikers to deliver the parole warrant.

19              What did you mean by a warrant on

20  the parolee?

21        A.    Meaning that there was not a warrant

22  in the system, whether it be he was an

23  absconder and it's already in NCIC or that we

24  faxed it over to appearance control -- I'm

25  sorry, not appearance control -- to Central

 1                    Gwendolyn Hogan

 2    Bookings pre-arraignment.  And when they turned

 3    the body over to New York City Corrections,

 4    they also turned the warrant over to New York

 5    City Corrections.

 6        Q.    So it's your understanding that when

 7    a parole warrant is sent to Central Bookings,

 8    for example, it becomes part of the parolee --

 9    his file, for better word to describe it as.

10    Is that right?

11        A.    Correct.

12            MS. COLLINS:  Okay.  I don't have

13        any follow-up questions.

14            We reserve our right to review the

15        transcripts under the federal rules.

16            MR. WERTHEIMER:  Yes.  This one

17        should be cleaner.

18            MS. COLLINS:  Yes, and much shorter.

19            MR. WERTHEIMER:  Yeah.

20            MR. KRIST:  Yeah.  We're certainly

21        all reserving the same rights.

22            MR. WERTHEIMER:  Yeah.

23            All right.  Thank you.

24            (Witness excused and deposition

25            concluded at 2:48 p.m.)

1          ACKNOWLEDGMENT OF DEPONENT

2      I, GWENDOLYN HOGAN, do hereby acknowledge that
   I have read and examined the foregoing   testimony
3   and the same is a true, correct, and complete
   transcription of the testimony given by me, and any
4   corrections appear on the attached errata sheet
   signed by me.

5

6   Page/Line       Correction       Reason

7   _____    _____    _____

8   _____    _____    _____

9   _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  Date: _____    _____

15         GWENDOLYN HOGAN

16

17  SUBSCRIBED AND SWORN TO BEFORE ME

18  THIS _____ DAY OF _____, 20____.

19  _____

20  NOTARY PUBLIC/JUSTICE OF THE PEACE

21  MY COMMISSION EXPIRES: _____

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3          I, Deanna J. Dean, a Licensed Court

 4  Reporter, Registered Diplomate Reporter, and

 5  Certified Realtime Reporter, do hereby certify:

 6          That GWENDOLYN HOGAN, in the foregoing

 7  deposition named, was present and by me sworn as a

 8  witness in the matter of Joel Uviles, et al. v. The

 9  City of New York, et al., at the time and place

10  therein specified;

11          That said deposition was taken before me

12  at said time and place, and was taken down in

13  shorthand by me, and was thereafter transcribed

14  into typewriting, and that the foregoing transcript

15  constitutes a full, true and correct report of said

16  deposition and of the proceedings that took place;

17          That before completion of the proceedings,

18  review of the transcript was requested.

19          IN WITNESS WHEREOF, I have hereunder

20          subscribed my hand this 31st day of

21          March, 2021.

22

23

24  _____

25      Deanna J. Dean, LCR, RDR, CRR
```